Filed 3/12/24  Sainte Claire Historic Preservation Foundation v. City of San Jose CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| SAINTE CLAIRE HISTORIC PRESERVATION FOUNDATION,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>CITY OF SAN JOSE, et al.,<br><br>Defendants;<br><br>MORTIMER & MIMI LEVITT FOUNDATION, et al.,<br><br>Real Parties in Interest and Respondents. | H050106<br>(Santa Clara County<br>Super. Ct. No. 20CV374459) |

This case presents a challenge by the Sainte Claire Historic Preservation Foundation (the Foundation) to the City of San Jose's approval of a Historic Preservation permit for the "St. James Park Capital Vision and Performing Arts Pavilion (St. James Park Master Plan) Project" (the Project) under the City's Historic Preservation Ordinance (the Ordinance, San Jose Municipal Code (S.J. Mun. Code) § 13.48.010 et seq.).

St James Park (the Park), known before the 1880's as St. James Square, is located within and is a contributing feature of San Jose's designated St. James Square City Landmark District. The Park is also more broadly a contributor to the St. James Square Historic District, since 1979 listed on the National Register of Historic Places and included in the California Register of Historical Resources. At issue is whether evidence in the administrative record of adverse impacts to the Park as an historical resource affected by the Project—mostly, as claimed, by the construction of a proposed outdoor performing arts venue within St. James Park (the Levitt Pavilion or Pavilion)—and related findings by the City compelled denial of the Historical Preservation permit, which is necessary under the Ordinance for the Project to proceed.

The Pavilion would hold outdoor musical concerts and events accommodating 5,000 attendees some 300 days per year and would alter or remove some historical character-defining features still existing in the Park. Denial of the Historical Preservation permit was required under S.J. Mun. Code section 13.48.240.C if the Project will be "detrimental to an historic district or to a structure or feature of significant architectural, cultural, historical, aesthetic, or engineering interest or value *or* is inconsistent with the purposes of [the Ordinance], despite any conditions" to which the Project may be subject through issuance of the permit. (Italics added.)

The Foundation also raises separate claims under the California Environmental Quality Act (CEQA) (Pub. Res. Code, § 21000 et seq.; further unspecified statutory references are to this code) and its implementing regulations (Cal. Code Regs., tit. 14, § 15000 et seq. (Guidelines)). These claims are first that the environmental impact report (EIR) for the Project was inadequate in addressing both consistency with the City's general plan designation of "Open Space, Park, and Habitat" intended for "low intensity

2

uses" and inconsistency with the Ordinance. The second CEQA claim is that the City's infeasibility finding as to the alternative of relocating the Levitt Pavilion to another downtown park location—Discovery Meadow—is unsupported because relocating the Pavilion was feasible and would reduce the adverse impacts to the Park as an historical resource to less than significant.

The trial court rejected both challenges to the Project, focusing primarily on the CEQA claims. The court concluded that the EIR adequately addressed and found consistency with the general plan and the Ordinance and that the City's infeasibility finding as to the Discovery Meadow alternative was supported by substantial evidence. As for the Foundation's local challenge under the City's Ordinance, the court viewed the Ordinance, specifically S.J. Mun. Code section 13.48.240, as operating in parallel to CEQA and likewise allowing the City in approving the Historical Preservation permit to use discretion to weigh the Project benefits against its adverse impacts and to override the indisputable harm or "detriment" to be caused by the Project to St. James Park as an historical resource. The court thus rejected the Foundation's argument that the term "detrimental" as used in the Ordinance strictly means " 'tending to cause harm' " or " 'causing damage or injury' " and "without regard to countervailing benefits or mitigating conditions." The court found the Foundation's interpretation of the Ordinance mandating denial of a permit for any project causing an "adverse impact—even if outweighed by overriding considerations so that CEQA approval would be appropriate"—to be unreasonable. The court thus construed the Ordinance to apply coextensively with CEQA such that overriding considerations and policy choices may lead to the grant of an Historical Preservation permit even if "detrimental" impacts to a historical resource are not fully mitigated or eliminated by the imposition of conditions.

3

We conclude that the Foundation has not established a CEQA violation. But, unlike under CEQA, on this record, the City has abused its discretion under S.J. Mun. Code section 13.48.240.C. It has failed to account for undisputed and supported findings that the Project, in fact, will be "detrimental to an historical district or to . . . [a] feature of significant architectural, cultural, historical, aesthetic . . . interest or value," even as subject to the conditions imposed for the permit issuance. Even if the Project would not compromise the locally designated St. James Square City Landmark District, the City has not accounted for the Project's acknowledged detriment to the St. James Square Historic District as listed on the National Register of Historic Places and as included on the California Register of Historical Resources, and to the Park itself as a feature of significant cultural, historical, or aesthetic interest or value, as provided by the plain terms of the Ordinance.

We accordingly reverse the judgment to the extent it denied relief in mandate as to the Foundation's claim under the Ordinance. We direct the trial court on remand to grant such relief, including set-aside of the issued Historical Preservation permit for the Project and remand to the City as the applicable administrative agency for any further consideration of the Project, including any revisions thereto, to ensure its compliance with the Ordinance. We otherwise affirm the judgment.

STATEMENT OF THE CASE

I.   *Factual Background*

A. St. James Park

St. James Park is a 7.5-acre urban park in downtown San Jose occupying two city blocks. It was plotted in 1848 by Chester Lyman and created during

4

San Jose's designated *Early American Period* from 1846 to 1870.[1] The earliest design landscape and the first improvements to the Park were made in 1867, when the building that became the Santa Clara County Courthouse was opened facing then St. James Square. At that time, a park concept was developed by William O'Donnell, a landscape artist, horticulturalist, and proprietor of a local nursery.

"The original features associated with nineteenth-century development [of the Park] are best described in [a] 1895-1896 [local] publication . . . : [¶] 'There has been a charming negligence, or careful simulation of such, in the arrangement of trees and shrubs, and as a result, the park presents the appearance of a natural grove, the trees in which seem to have been most fortunately distributed. There is a greater variety than is usually found, the list including eucalyptus, pepper, sycamore, pine, cork elm, cypress, palm, willow, maple, umbrella, orange, birch, yew, locust, oak and a variety of flowering trees and shrubs.' . . . 'Drooping pepper trees also add beauty to the scene, the bunches of red berries contrasting with the green of the waxy leaves. There are everywhere wide stretches of greensward, and flowers bloom there every day in the year. Seats are provided in sunshine and shade, and a gardener is employed to care for the trees and flowers.' " (Italics omitted.)

As evaluated in the 1970's, the Park as a historic resource was found to include seven character-defining features, which are "prominent or distinctive recurring elements, aspects, qualities, or characteristics of an historic resource type, style, or period that contribute significantly to its physical character and

---

[1] "The City of San Jose historic context statement identifies six historic periods. The *Early American Period* ranges from 1846-1870, the time when Mexico lost effective control over the pueblo to when horticulture began to evolve as the predominate local industry . . . ."

appearance dating to the resource's period of significance" and which "should be retained in order to ensure continued eligibility as a historic resource." These seven features for St. James Park were identified as: 1) north/south, east/west axis paths; 2) diagonal cross axis paths; 3) circular features at four corners; 4) an undulating path around the perimeter connecting the circular features; 5) random placement of statuary and monuments; 6) flat ground plan with a lack of topographic variation; and 7) an informal planting scheme.

In addition, based on later "evaluations of the park's characteristics from the 1970's to today, the key character-defining features" also include:

- "natural landscaping features and topography: informal arrangement of large trees combined with open grassy lawns on a flat ground plan";
- "physical shape, orientation, location, and geometry: large and expansive green public open space in the middle of an urban environment and spatially relating to and connecting with surrounding urban and civic uses"; and
- "pathways: a system of pedestrian walkways and paths in various linear and curvilinear forms that connect various sections and features of the park to each other, and to uses surrounding the park."

(Capitalization omitted.)

On top of its physical features, St. James Park has also been the site of historical events. President McKinley gave a speech there in 1901 and the McKinley statue was later placed to mark this spot. "Over the years, beginning as early as 1868 and as late as 1981, [the Park] was the staging site for Ku Klux Klan rallies. It also continued to serve as the site for political events such as the 1968 visit by Robert Kennedy during his campaign for President. The Kennedy Podium stands today to memorialize that day. George McGovern returned four years later to give a speech at the park during his failed attempt to unseat

6

Richard Nixon from the Presidency." The Park was also the 1933 site of the mob lynching of the two alleged killers of Brooke Hart, heir to the local department store L. Hart & Son, who had been kidnapped for ransom.[2]

"One of the earliest parks in California, the site has evolved over time, and today continues to be an important landmark and cultural landscape that conveys historic and community value to the downtown's sense of place." "The original design is consistent with and exemplifies landscape design concepts during the 1860s and 1870s promulgated by important . . . landscape designers such as Frederick Law Olmstead, and aspects of that design remain today in the meandering walkways and naturalist placement of landscaping elements. The original design was enhanced in the 1880s by the more formalized center focused on a fountain and embellished with ornamental plants brought in by landscape designer Rudolph Ulrich."

In the 1950's, "South Second Street was extended, bisecting the single park into two sections and causing a disruption in design, pedestrian pathways, and formation of tree locations and canopies." During the 1970's, "[p]ark advocates unsuccessfully argued for removal of [that street] intrusion across the park" and "to re-introduce the central fountain [that had been previously removed] in an attempt to resurrect the 1880s St. James Square design." These efforts, though unsuccessful, prompted the City "in 1978 to initiate the listing of St. James Square on the National Register of Historic Places. This occurred in concert with a city-wide survey of historic resources." The nomination form for the listing in the National Register identified the seven "character-defining features" enumerated above.

---

[2] We take judicial notice of this historical fact.

"In 1979, St. James Square was listed on the [National Register of Historic Places] as a historic district.[3] The park was included in the listing as a contributor to the district, being identified as a key feature of the square surrounded by historically significant civic, religious, and private structures. In 1984, the San Jose City Council designated St. James Square (including the park) as a City Landmark District. Both the square (as a designated National and local historic district) and the park individually are historic resources" under CEQA.[4] (See § 21084.1 & Guidelines, §§ 15064.5, 15300.2, subd. (f).) This local Landmark District designation occurred two years after the City in 1982 had first designated "the properties surrounding the park as an area of Historic Sensitivity" as part of the City's Horizon 2000 General Plan.

"The areas of significance for the National Register St. James Square Historic District are Architecture, Community Planning, Exploration/Settlement, and Landscape Architecture, . . ." In 1989, "the [San José] City Council adopted the St. James Square Historic District Guidelines which apply to the surrounding properties as well as [to] the park itself." The City's commissioned August 2019 Historic Resource Project Assessment[5] placed

_____

[3] The California Register of Historical Resources (see § 5020 et seq.) was "modeled closely after the National Register of Historic Places . . . [and] [t]he criteria are nearly identical." "The California Register … includes properties listed in the National Register, . . ." (See § 5024.1, subd. (c); Cal. Code Regs., ch. 11.5, § 4851, subd. (a)(1).)

[4] "The locally designated St. James Square Historic District has a different set of boundaries from the National Register St. James Historic District. The local district encompasses all the properties adjacent [to] the park within its 'area of historic sensitivity' across the corner intersections."

[5] The August 2019 "Historic Resource Project Assessment" was prepared for the City by Archives & Architecture, LLC, acting as an outside consultant for the Project. In December 2019, Archives & Architecture, LLC released a

the "period of significance for the park" "from 1867, when improvements were first made, to 1968, the year that Robert Kennedy spoke at the park during his campaign for President of the United States." During the earlier local landmark process, the City had determined the period of significance for the square as a historic district to be the 1860's to the 1930's but also concluded that since then, "more recent events and features of the park have gained historic significance." For purposes of the Project EIR, the period of significance was determined to be 1867 to 1968.

"The current landscape design of St. James Park is derived from some early plantings and a renovation . . . that was based on a 1985 Master Plan." Before this, "the park ha[d] undergone four significant transformations since coming under public ownership in the 1850s, and it has been the subject of a number of master planning studies." "During the 1960's, after much controversy, the St. James Community Center . . . was constructed in the park as an interim use; it added to the disruption of the original layout of the 1860s St. James Square. [The Community Center] was removed in 2010 and the area covered with lawn, but the perimeter meandering walkways and diagonals were not returned to their original form as part of the demolition project, nor were any new trees planted to restore the tree canopy that had been removed to accommodate the 1960s construction."

"The 1985 Master Plan proposed to unify the park by reducing the impact of Second Street. This plan was not fully implemented due to the introduction of the light rail and the downtown's transit mall . . . , although a new replica

supplement entitled "Memorandum. Rehabilitation Project Assessment," after some Project design revisions had been made. Both reports were later incorporated into the May 2020 draft EIR for the Project. We quote liberally from these reports, as well as from other parts of the EIR, for our background facts.

fountain was constructed on the west side of North Second Street, reminiscent of the earlier fountain, as part of a two-fountain project that was never fully realized due to budget constraints. The light rail St. James Station structure interrupted the continuity of the perimeter pathway at the south end of the park." "Granite curbs at the perimeter of the site were originally a character-defining feature, but street improvements since the installation of the light rail line along North First Street and conversion to the angled parking along East St. John Street has resulted in loss of much of this curbing. Granite curbs continue to exist along the East St. James Street frontage and can be considered a significant remnant of the original character-defining features."

"Other recent changes resulting from the 1985 master plan included diagonal curving walkways on the west half of the park, the controversial removal of the Elm trees in 1990 (which were removed but not replaced with similar large-canopy trees), and the installation of a new children's playground in the southeast quadrant of the park. The playground project included a resurfacing of the perimeter walkway system adjacent [to] the playground to concrete." "Since the construction of the children's playground, other changes to the park have occurred, including the installation of permanent exercise equipment and dog park fencing on the east side of the park, creation of a concrete-based picnic area with permanent tables and benches at the park center where the south end of the community center had been located, and placement of a large cargo container near the dog park." Three memorials or monuments remain within the Park.[6]

---

[6] "The McKinley Memorial is a tall statue atop a stepped square base. The Naglee Memorial is a bas-relief wall on a stepped rectangular platform. The Kennedy Podium is a modern curved wall element with a permanent podium. This memorial is placed on a raised circular platform. There is a modern fountain within the western half of the park near the . . . light rail station."

As described in the City's undated Historical Resources Survey, referenced in the EIR, "the present condition of St. James Park consists of two equal square blocks bisected by a one-way, three-lane arterial (Second Street) running north to south. Most of the dense vegetation has been trimmed so that at present the informal arrangement of large trees and the open grassy lawns define the general design character. The one interesting aspect remaining from the more formal gardens of the late 19th century is the unusual diagonal path system with its ornamental [curlicue] shapes and yet overall symmetrical pattern. To this day, St. James Park conspicuously represents the one significant piece of greenery, and the dominant urban open space in the central core district of the City." (Italics omitted.)

Below is an aerial photo (from the administrative record) that shows the Park as it generally exists today:



*Current bird's eye view from south, copyright Google*

"The historic integrity of St. James Park has been reduced in the recent past, due to changes to or loss of character-defining features, including the loss of the north/south pedestrian axis path, partial loss of the diagonal axis paths, modification of the diagonal axis paths to a curved layout (recalling an earlier period of development), and disruptions to the undulating perimeter path. Changes to the perimeter path include removal of the northeast quadrant, paving changes near the children's playground, and the blocking of its continuity at the Saint James Station platform. [¶] The change in character of the informal planting scheme as described in the National Register application, specifically the loss of the tree canopy, also has reduced the integrity of the original landscape setting. Gone by mid-century was the more formal ornamental landscaping around the central focus of the historic fountain. Although this central focus was not discussed in the National Register application, its loss has had a substantial impact on historic integrity to the 70-year period in which this formal center had existed. The 1980s master plan design sought to recreate this focus, but in a relaxed and more informal paired center, and the plan was only partially implemented. [¶] The landscape setting, however, has been enhanced by the cultural associations that the park has gained over time. The human use of this square and park over its period of significance of over a century, 1867-1968, as a center of public life and leisure, as a forum for political discourse, for events of community importance, and as a site of commemoration, makes it one of San José's most important historic places even though it lacks substantial integrity to its original form. The park provides a cultural and social reference point for San José's past within the city center."

Thus, the "[t]he site as it exists today has lost much of the quality that had been associated with the park during most of the years of its period of

historic significance." But it still remains "a contributor to the St. James Historic District *at both the local and national levels*." (Italics added.) "[W]ith the additional removal of features *due to this* [P]*roject*, and the potential insertion of structures and uses not compatible with the historic nature of the setting, *the park would no longer be a contributor to the National Register of Historic Places* but rather be considered non-conforming to that listing. At the local level, the park would still continue to represent important patterns of early San Jose based on its use, location, and interpretive elements. As such, it would appear to continue to be a contributor to the locally designated St. James Square City Landmark District." (Italics added.)

Moreover, "St. James Park itself is a significan[t] individual historic resource. Although listed on the National Register of Historic Places as a contributor to the St. James Historic District, it is the central and key component of that district, without which the district would lose its essence." "[E]ven with a reduced level of historic integrity, . . . St. James Park appears to be individually eligible for listing as a City Landmark" with a period of significance between 1867 to 1955 in that it "has character, interest and value as part of the local, regional, state or national history, heritage and culture"; "is a location as a site of a significant historic event"; and "exemplifies the cultural, social, and historic heritage of the City of San Jose."

B. The Proposed Project

At a City Council meeting in 2015, the City: "a) endorsed the concept of a Levitt Pavilion in St. James Park; b) endorsed formation of a Levitt Pavilion Steering Committee; c) directed the Steering Committee to complete fundraising feasibility and preliminary business plan; and d) directed staff to work with the Steering Committee to develop a preliminary design, complete environmental review and identify operation and maintenance funding." Staff

13

thereafter "worked with the Mimi and Mortimer Levitt Foundation to establish a Levitt San José Pavilion project." This "Foundation is a non-profit organization that provides capital funding resources to support the construction of a multi-use structure that would have the capacity to host outdoor music events year round at no cost to patrons."

Thus, "[r]ecent focus on the future of St. James Park was catalyzed by interest in the establishment of a Leavitt Pavilion within the park boundaries."[7] The City ultimately conducted a design competition for the Park and one submitter was selected to "proceed with design development of their park rehabilitation concept with the introduction of a Leavitt Pavilion into the northeast corner of the park." The Project proposes to "renovate and revitalize the site while maintaining the existing park use (passive park uses and events) and establish new programmatic elements, including events at a newly constructed park pavilion." The Project would result in demolition and removal of most of the existing improvements at the Park except monuments and heritage trees. A Project rendering from the December 2019 Memorandum Rehabilitation Project Assessment is shown below:

---

[7] According to its website, the "Levitt Foundation exists to strengthen the social fabric of America. [It] partner[s] with communities to activate underused outdoor spaces, creating welcoming, inclusive destinations where the power of free, live music brings people together and invigorates community life." There are currently 41 "Levitt Venues" and "Levitt Amp Sites" located throughout the country. (See Levitt Foundation <https://levitt.org/locations/> [as of March 12, 2024], archived at <perma.cc/KTB7-NP9H>.)



*St. James Park Project Plan from CMG 25% Design Set: Update 1, Sheet G0.00. 10/11/19*

According to the August 2019 Historic Resource Project Assessment, which recommended some design changes to the Project to achieve greater compatibility with the historic setting, "[t]he proposed renovation, as well as the incorporation of a Levitt Pavilion into the park, appears to be achievable as an interpretive park project of a historical site, although as proposed will have an adverse environmental impact on the site itself, although will not compromise the historic integrity of the historic district it sits within." The Project was observed in this report to "preserve[] some aspects of the historic integrity of the historic St. James Park, *but the loss of the original perimeter meandering walkways, remaining granite curbs, relocation of monuments, and the insertion of new structures that disrupt the historic feeling of the setting will significantly*

15

*affect the ability of the park to retain its historic qualities and sense of authenticity. . . .* [¶] The [P]roject . . . preserves the surrounding historic district, which will retain most of its historic integrity as an important public square, although the authenticity of the park itself will be reduced." (Italics added.)

As noted in the EIR in its discussion of design alternatives, the proposed Project "was assessed for consistency with the St. James Square Historic District Guidelines and the Secretary of the Interior's Standards [for the Treatment of Historic Properties (Secretary's Standards; see 36 C.F.R. ch. I, part 68)].[8] Per the St. James Square Historic District Guidelines, the assessment found the monument walk to be inconsistent with the layout of the original perimeter path, the proposed park structures are too modern in design and would have an incompatible color palette, and the diagonal paths are not fully preserved. Per the Secretary['s Standards], *the assessment found the [P]roject inconsistent due to the loss of the diagonal paths and the reinterpretation of the perimeter path.* While the incompatibility of the building design is a factor in the loss of integrity, *the primary issue is the diagonal and perimeter pathways which are key character-defining features of the park.*" (Italics added.)

As to this character-defining feature, the EIR also noted that the "proposed design would impact or not fully restore the [Park's] pathways."

8 Under Guidelines section 15064.5, subdivision (b), a "project with an effect that may cause a substantial adverse change in the significance of an historical resource is a project that may have a significant effect on the environment." And under subdivision (b)(3), a project that follows the Secretary's Standards "shall be considered as mitigated to a level of less than a significant impact on the historical resource." (See also Guidelines §§ 15126.4, subd. (b)(1) [mitigation measures reducing project's impact on historical resources to less than significant]; 15331 [categorical exemption for historical resource restoration/rehabilitation].)

Further, "[t]*he loss of the meandering path would impair the integrity of the historic park design . . . .*" (Italics added.) And "[t]o allow for the diagonal paths, the [P]avilion would need to be removed from the [P]roject plan as there would be no space to accommodate the [P]avilion with the diagonal paths."

The Project would install the following new physical improvements in the park: a stage for a performing arts Pavilion in the northeast corner of the park and a single-story support building; a building for a café and public restrooms; an open air picnic pavilion and picnic grove; two fenced dog parks; a multi-use grass field (McKinley Meadow); a plaza area; a playground; a fountain; a park information center with restrooms; security lighting along the perimeter of the park and pedestrian pathway; landscaping, including the planting of 196 trees; and a decorative garden fence.

The Project also includes modifications to the transportation network, including the closure of North Second Street, which currently bisects the site, to vehicles and the rerouting of buses; improvements to the existing Valley Transportation Authority light rail platform for greater safety and pedestrian circulation during park events; replacement of 12 existing parking spaces on East St. James Street with a loading zone for events and passenger drop-off and pick-up on non-event days; pedestrian improvements; and utility improvements.

Between 2013 and 2018, the Park hosted a total of 125 events, with an average of 21 events per year. These included concerts, festivals, movie nights, performances, yoga, and games. Attendance ranged from fewer than 10 to 7,500 people. As envisioned, the proposed Levitt Pavilion is an outdoor music and performance venue capable of accommodating a variety of events. It would be equipped with lighting and sound amplification, a 4,000 square foot stage, a single-story support building with an office, dressing rooms, bathrooms, and storage areas, and a large open lawn area for audiences. A permanent canopy is

proposed to reach 35 feet, with triangular panels covering the stage area and extending along the northern perimeter of the audience lawn. "Lighting for the performing arts pavilion (including the stage) would be supported by the canopy structure and lighting towers within the audience areas. The sound system would include arrays of loudspeakers from the stage and distributed loudspeakers throughout and/or around the audience lawn area." "It is assumed that 50 to 300 events (with up to 72 large concerts/events) would be held annually at the performing arts pavilion, with 20 to 5,000 attendees." Proposed commercial uses would include a café and food, beverage, and merchandise vendors associated with Pavilion events; street performers; and a farmer's market.

A detail rendering of the proposed Pavilion from the administrative record is shown below:



The Archives & Architecture, LLC December 2019 Memorandum that supplemented their initial Historic Resource Project Assessment after some Project design changes were made concluded that "the proposed design is partially consistent with the Secretary [Standards]; however, *the design is not consistent with Standards 2, 5, 9, and 10 because the project does not fully*

*preserve or restore the character-defining diagonal and meandering paths.*"
(Italics added.)

It further concluded that "much of the revised design is now substantially consistent with the surface treatment/materials and color guidelines in the St. James Square Historic District Guidelines" while acknowledging that the design is "not fully compatible with the 'letter' of these guidelines." "[T]he review's interpretation of the guidelines suggests that the buildings and structures are compatible with the park design, rather than in compliance with the building design parameters that were clearly written to preserve the pattern of imposing buildings surrounding the park. The layout of the proposed pathways, however, does not appear to be fully compatible with either the letter or intent of the Guidelines."

### C. Environmental Review and Project Approval Under CEQA

The City published the draft EIR for the Project in May 2020. It listed 12 Project objectives: 1) "Increase everyday use and enjoyment of St. James Park by making it a prime destination spot for downtown residents and the larger community"; 2) "Make the park a safe, fun, and family friendly destination that compliments the surrounding historic district"; 3) "Incorporate the historic monuments in the park to celebrate and respect San Jose's history and future"; 4) "Work in partnership with non-profits and other organizations to construct a performing arts pavilion and build upon these private-public partnerships to ensure quality park stewardship"; 5) "*Develop a cultural asset conducive to creating a thriving destination and building community through music*"; 6) "[i]mprove maintenance, operations, security services, and other public services in order to ensure a well[-]maintained, clean and safe facility"; 7) "*Transform an underutilized neighborhood park into a prime destination where music concerts and other activities invigorate community life*"; 8)

19

*"Integrate arts and culture into the community to spark economic growth, drive community engagement, and enhance overall quality of life"*; 9) "Provide infrastructure to support and facilitate music concerts, community festivals, and other park programs"; 10) "Provide vibrant play spaces that are engaging, all-inclusive, and accessible"; 11) "Encourage, engage, and enable the community to participate in the visioning and implementation process"; and 12) "Reinforce a vibrant, dynamic downtown by building on existing assets including previous plan and proposals based on community input." (Italics added.)

The draft EIR, consistently with the Archives & Architecture, LLC reports made a part of it, found that the Project, as proposed, was not fully consistent with either the local St. James Square Historic District Guidelines or the Secretary's Standards. And it concluded that the Project would have four significant, unavoidable environmental impacts. These were an aesthetic impact on the visual character of the Park because the design is not fully consistent with the Secretary's Standards (AES-1); an impact on cultural resources due to a substantial adverse change in the significance of a historical resource under Guidelines section 15064.5 (CUL-1); a noise impact in the generation of a substantial temporary or permanent increase in ambient noise levels near the Project in excess of standards established by the local general plan or noise ordinance or applicable standards of other agencies (NOI-1); a recreation impact to the visual character and historical integrity of the Park and an operational noise impact (REC-1).

Commenters to the draft EIR included the Foundation and the Sainte Claire Club, whose building—historical in its own right—is located adjacent to the Park. Other commenters included residents of buildings situated directly around the Park. The 30-plus comments, among other things, addressed noise

20

impacts from events to be held at the Pavilion and Project impacts to historic resources, along with the methodology of the EIR's historic analysis. They included suggested feasible mitigations and Project revisions, including compliance with the Secretary's Standards and relocation of the Pavilion to what was identified and evaluated in the EIR as an alternative downtown site—Discovery Meadow.

A first amendment to the draft EIR was prepared for the City to provide responses to comments and make other revisions. The draft EIR and first amendment constitute the final EIR, which found that even with mitigation measures, the Project would still result in significant and unavoidable impacts to aesthetics, cultural resources, noise, and recreation, as described above. Mitigation measures were identified and addressed, and as part of the analysis, alternatives were explored to reduce the Project's significant, unavoidable impacts. These were no project, an enclosed (as opposed to outdoor) pavilion for 5,000 attendees, an enclosed pavilion with an alternative footprint, a pavilion with no concerts, Discovery Meadow as an alternative pavilion location; and other design alternatives.

After review of the Project by the Planning Commission, which recommended approval, the City Council held a public hearing on October 27, 2020, at which it certified the final EIR and approved the Project, adopting Resolution No. 79770. The Resolution made certain findings concerning significant impacts, mitigation measures, and alternatives, and it adopted a Statement of Overriding Considerations and a related Mitigation Monitoring and Reporting Program. As reflected in the EIR, the City Council determined that the Project will have the same noted significant and unavoidable impacts in the areas of Aesthetic, Cultural Resources, Noise, and

21

Recreation, which are all associated with cultural resources and operational noise.

Resolution No. 79770's determination that the Project, even with mitigation, will have a significant, unavoidable aesthetic impact was because it will "impact the visual character of the site [as] *the design is not fully consistent" with the Secretary's Standards*. (Italics added.) The related finding was that "[i]mplementation of the Project would result in reconfiguration of the existing park to include new buildings and performing arts pavilion which would change the character of the existing park and square. . . . [T]he change in setting and character of the Project could result in significant impacts if the change would also result in a significant historic impact. Implementation of the Project would change the visual character of the site and the buildings[,] and, as designed, would be constructed *in a manner that would impact the historic significance of the park and the St. James Historic District and[,] therefore, impact the visual character of the site*." (Italics added.) The facts cited in support of this finding included that "absent a redesign of the Project that would be fully consistent with the Secretary['s Standards], the proposed mitigation measures would continue to reduce the visual character impact, but would still result in a significant unavoidable impact."

Resolution No. 79770's determination that the Project will have a significant and unavoidable cultural impact was because it "is not in substantial conformance with the general character and surface treatment (specifically fenestration, materials, detailing, and color) of the applicable 1989 St. James Square Historic District Guidelines and *is not in substantial conformance with the Secretary*['*s Standards*] *regarding the proposed structures and overall design*. Construction of the Project could result in existing historic elements in the park being damaged and implementation of the Project would

22

impact the historic integrity of St. James Park and the St. James Park Historic District." (Italics added.) The Resolution found that identified mitigation measures "would only reduce construction impacts to cultural integrity of the park elements and park, *but the implementation of the Project would continue to not be fully consistent with the Secretary*[*'s Standards*]. Therefore, there are no feasible mitigation measures that would reduce the impact to a less than significant level." (Italics added.)

The facts cited in support of this finding of cultural impact restated the Project's inconsistency with both the 1989 St. James Square Historic District Guidelines and the Secretary's Standards. Also cited was the observation that if additional character-defining features of the park are lost, as the Project contemplates, the Park would no longer qualify under the National Registry listing as a contributing property. *"By removing or altering character*[-]*defining features such as the north/south and east/west axis paths, diagonal cross axis paths, circulate features at four corners, undulating path around the perimeter connecting the circulate features, random placement of statuary and monument, flat ground plan with a lack of topographic variation, and informal planting scheme, the Project would not be in substantial conformance with the general character and surface treatment of the 1989 St. James Square Historic District Guidelines and with the Secretary*[*'s Standards*]. *Therefore, the Project would affect the historic significance of the site, change eligibility, remove character-defining features, and/or compromise integrity of the Project site and the Project would have a significant impact on the historic integrity of the park and the district."* (Italics added.)

Resolution No. 79770 further determined that operation of the proposed Levitt Pavilion, even with mitigation measures, would result in interior noise levels within the residences along St. James Street above the City's residential

interior noise standard. It made a finding that with amplified music events at the Pavilion ending by a certain time of night as a mitigation measure, the noise impact would vary depending on the type of event and would be reduced but not eliminated. Identified mitigation measures would not "ensure that the Project would not result in a substantial increase in interior noise levels at the nearest noise-sensitive receptors[.] . . . [T]he proposed [P]avilion component of the overall Project would result in operational noise to the City's residential interior noise standards, even with the limitation of usable hours."

The Resolution finally determined that the Project would have a recreation impact in that the proposed "changes to St. James Park would impact the visual character and historic integrity of the park and would result in an operational noise impact." It found that even with "the implementation of identified mitigation, the visual, cultural, and noise impacts resulting from the Project would be significant and unavoidable. . . . Therefore, the Project would be a recreational facility that would result in adverse physical impacts to the environment."

Resolution No. 79770 also discussed alternatives to the Project, including a no-project alternative. As relevant here, alternative number 4 would "relocate the proposed [P]avilion to the Discovery Meadow and keep all other program[m]ing and proposed park elements (i.e., playground, fountain, monument walks, etc.) at the Project site." Discovery Meadow "is an approximately six-acre public park located downtown . . . approximately one mile southwest of the Project site. [It] has large open lawn areas and currently hosts a variety of events. There are no sensitive receptors such as residential developments located near Discovery Meadow." As such, "this alternative would avoid the Project's significant and unavoidable operational noise impact as it would not result in impacts to nearby sensitive receptors. Because Discovery

24

Meadow is not located within a historic district or designated a historical resource, the development of the Project at this alternative location would avoid the Project's impact to historic resources. However, it does not guarantee that the relocation of the [P]avilion would fully reduce [impacts to] historic resources [at] the St. James Project location as other components [of] the park are still kept as the originally proposed Project."

The Resolution's findings about the Discovery Meadow alternative said that it "would meet most of the Project objectives (by revitalizing St. James Park and providing a performing arts pavilion, though at a different location from the Project), except one main objective that specifies transforming an underutilized neighborhood park into a prime destination where music concerts occur. . . . As the objectives (Object 5, 7, and 8) of this Project [are] to revitalize and transform an underutilized neighborhood park through a combination of physical and programmatic improvements (including through activation of musical events), this objective would not be met with the relocation of the [P]avilion to another site. Therefore, this alternative is rejected."

Alternative number 5, labeled "Design Alternative," is a project redesign that would "reintroduce the diagonal paths and reorientation of the perimeter path to be more consistent with the original pathway. The new park buildings such as the proposed café shop and associated public restroom would remain in the Project, but would be redesigned to be more compatible with required standards such as the 1989 St. James Square Historic District Guidelines and the Secretary['s Standards]. This alternative would result in the removal of the [P]avilion as the diagonal pathways would not accommodate the placement of an outdoor performance venue with the desired capacity. The lawns in the northwest quadrant would be segmented or removed, and amenity spaces within the southeast quadrant would need to be redesigned to allow for an

25

uninterrupted path. Realignment of the perimeter path would likely require changes to the placement of proposed amenity spaces and existing memorials proposed for preservation within the park."

The Design Alternative, identified as the environmentally superior alternative, "would result in lesser impacts to the historic resources." It was found that keeping some of the park's character-defining features that would otherwise be impacted by the proposed Project could reduce the cultural resources impacts to a less than significant level. To do so, the "Project site would need to reintroduce the diagonal paths would segment lawns and areas, relocate monuments and features of the park, and not construct the proposed [P]avilion." But this alternative was found not consistent with five of the 12 Project objectives. "Specifically, it would not be consistent with objectives to enhance and provide opportunities of gathering and use of the park through a music venue or facility that would facilitate community music and programs. Keeping all the character[-]defining features or a full reversion to the historic layout could affect other park programming, which could result in not meeting other objectives of the Project. Therefore, this alternative is rejected."

Resolution No. 79770 also contained the City's Statement of Overriding Considerations for approval of the Project. It specifically found that the "Project has eliminated or substantially lessened all significant effects on the environment where feasible, and finds that the remaining significant, unavoidable impacts of the Project are acceptable in light of economic, legal, environmental, social, technological or other considerations . . . , because the benefits of the Project outweigh its significant adverse environmental impact." The City found that each of the overriding considerations listed "constitutes a separate and independent basis for finding that the benefits . . . outweigh its significant environmental impacts and is an overriding consideration

26

warranting approval of the Project." The City cited its Envision San Jose 2040 General Plan, the 2015 Saint James Revitalization Strategy, and Activate SJ Strategic Plan among the matters supporting its determination, and specifically listed certain policies, goals, strategies, and elements of these and other City documents or plans that buttressed the determination. Listed Project benefits included promoting economic benefits, increasing property values overall, and directing tax revenue, tourism, and rental events. The Statement of Overriding Considerations finally asserted that the City "weighed each of the[se] . . . benefits" of the proposed Project "against its unavoidable environmental risks and adverse environmental impacts identified in the Final [EIR]" and determined "that those benefits outweigh the risks and adverse environmental impacts," which were determined to be "acceptable and overridden."

The Notice of Determination was then issued on October 30, 2020.

D. Historic Preservation Permit Under the Ordinance

Because the Park is a contributing property to the St. James Square City Landmark Historic District, a designated City Landmark Historic District, the Project requires the issuance of an Historic Preservation Permit under S.J. Mun. Code section 13.48.240.[9] For context, for the permit to issue under this section, and subject to such conditions as may be imposed, the Planning Director, or City Council on appeal, must find that the proposed project 1) will not be detrimental to an historic district or to a structure or feature of significant architectural, cultural, historical, aesthetic, or engineering interest or value, and 2) is consistent with the spirit and purposes of the Ordinance.

_____

[9] That the Park is a contributor to the listings on the National Register of Historic Places and the California Register of Historical Resources does not require the issuance of an Historic Preservation permit under the Ordinance, as S.J. Mun. Code section 13.48.210.A. requires such a permit for "any work" to be performed "on a city landmark or in a *city* historic district." (Italics added.)

27

The City of San Jose Historic Landmarks Commission is an advisory body to the City Council and City Manager on matters of historic preservation. In October 2019, the City's Department of Parks and Recreation applied for an Historical Preservation permit for the Project "to allow for a comprehensive renovation . . . that includes construction of a new performing arts pavilion, a central plaza, small commercial buildings, playground, streetscapes improvements, fountain, walk-ways and other landscape and park amenities."

On October 7, 2020, the Historic Landmarks Commission held a public hearing and recommended that the Planning Director approve the permit on two conditions—that the Project funding and construction be done all at once and that any later detailed Project design be brought back before the Commission. Later that month, on October 28, 2020, the Planning Director conducted a noticed public hearing on the permit application and approved it, subject to recommended conditions. The Foundation submitted a comment letter before the hearing objecting to the permit as being in violation of the Ordinance.

The Historic Preservation permit issued by the Planning Director included the following findings:

"The [P]roject is consistent with the Envision San José 2040 General Plan Land Use/Transportation Diagram designation of Open Space, Parkland, and Habitat in the Downtown growth area because it retains the parkland use and conforms with the envisaged uses."

- "The [P]roject is consistent with the General Plan Historic Preservation Land Use policies . . . in that St. James Park will continue to represent important patterns of early San José based on its use, location, and interpretive elements and the [P]roject preserves the essential form and integrity of the park's history."

28

- "Subject to conditions, the work will not be detrimental to the significant architectural, cultural, historical, and aesthetic interest or value of St. James Park and is consistent with the purposes of [S.J. Mun. Code] 13.48 . . . because it:
  [¶] a. Preserves the park's location within the St. James Square City Landmark Historic District and the downtown.
  [¶] b. Preserves and continues the historic use as a community park, while some of the individual uses within the park will be new or altered. . . . The new uses require some alteration of original fabric. They are generally supportive of the continued and improved use of the square as a public open space in downtown San José. Because the use of the park will continue to preserve the open space and public use of the center focal point of the historic district, the [P]roject is compatible with rehabilitation standards for use. [¶] c. Preserves most of the significant character-defining features of St. James Park. The historical focal point of the St. James Square City Landmark Historical District is the landscaped character and spatial understanding of the park. The [P]roject maintains the park as the focus of the historic district through the diagonal pathways and rich plantings and provides continuity for repetitive plant materials. [¶] d. Relates to the historic design intent as a reinterpretation of St. James Park, with a botanically organized understory, many new trees which may restore the tree canopy that has been mostly lost, and diagonal walkways. The proposed design provides large-scale pathways and organizing motifs that are compatible with the bulk and scale of the historic district

29

proportions. [¶] e. Differentiates the design from the original design and represents modern materials and designs. There are no proposed new landscaping elements that might be mistaken for original features. . . . [¶] f. Preserves the essential form and integrity of the property history and the design is reversible."

- The "[P]roject will have a *significant and unavoidable impact on the **National** significance of St. James Park* under [CEQA]. The [P]roject does not fully comply with the *1989 St. James Square Historic District Guidelines and the Secretary[*'s Standards*]. The City of San José prepared a Draft [EIR] for the [P]roject. While the [draft EIR] concluded that impacts to Cultural Resources are significant and unavoidable, the design of St. James Park has continued to evolve as a center of civic life, and the programming of public events (and their related structures such as the proposed performing arts pavilion) are viewed as evolutionary changes within the cultural landscape of the locally significant historic resource that are consistent with its historic sense of place and with the purposes of the . . . Ordinance." (Italics added.)

- "St. James Park will continue to qualify as a contributing property to the locally designated St. James Square City Landmark District and is also eligible for designation as a Candidate City Landmark."

The Historic Preservation permit for the Project listed 25 conditions, which included, as relevant here, conformance with mitigation measures

30

contained in the Project EIR,[10] the establishment of the Park's historic baseline conditions by a qualified historic architect, the preparation and implementation of an Historic Resources Protection Plan by the historic architect to protect historic resources during construction, a plan for repairs per the Secretary's Standards for any construction damage to historic resources, return of the Project for review and comments by the Historic Landmarks Commission at the completion of design development, the Project's construction in one consecutive phase, retention of certain heritage trees, and amplified musical events at the Pavilion ending by 10:00 p.m.

The Sainte Claire Club appealed the Director's decision to issue the Historic Preservation permit to the City Council, the final step in the prescribed administrative process under the Ordinance and thus one required for administrative exhaustion purposes. The appeal contended that the Project is inconsistent with the Ordinance on account of its "oversized [P]avilion" and intensity of proposed events, and lack of substantial conformance with the Secretary's Standards and the general character and surface treatment recommendations of the St. James Square Historic District Guidelines.

The City Council as the final administrative arbiter conducted a "de novo" hearing of the St. Claire Club's appeal under S.J. Mun. Code section 13.48.280 on December 15, 2020. The Council denied the appeal and adopted Resolution No. 79848 to approve the permit. The staff report generated before the hearing indicated that the [P]roject had been reexamined "in its entirety against all applicable standards" to the conclusion that it "meets the requirements of

---

[10] The EIR acknowledges that it was intended to be reviewed and used with discretionary approval processes that included those required under the Ordinance for issuance of the required Historic Preservation permit for the Project.

31

the . . . Ordinance and is consistent with" the by-then certified final EIR general plan, and Ordinance, and it recommended denial of the appeal.

A focus of the staff recommendation was distinguishing between environmental review of historic resources as required under CEQA, meaning against the standards set forth at Guidelines section 15064.5, and the standards for issuance of a Historical Preservation permit under S.J. Mun. Code section 13.48.240 of the Ordinance. The staff report emphasized the many changes and loss of character-defining features to the Park over time, in contrast to its landscape setting having been enhanced by "cultural associations that the park has gained in more contemporary periods." This emphasis was also reflected in the report's observation that the "human use of the square and park over its years of existence as a center of public life and leisure, as a forum for political discourse, for events of community importance, and as a site of commemoration, make it one of San José's most important historical places, even though it lacks substantial integrity to its original form."

The staff report further highlighted the Project's retention of the Park's location, setting, "historic design" as a "reinterpretation of the park," "feeling," and "associations," and noted that "there are few materials or examples of artisanship extant to preserve." (Italics omitted.) These were cited as factors supporting that the Project would maintain the Park's historic integrity by "provid[ing] a cultural and social reference point for San José's past within the city center." "Therefore," staff concluded, "the historic integrity of St. James Park would not be substantially degraded, and the [P]roject would not be detrimental to the site or the historic district."

The staff report further downplayed the Project's undisputed inconsistencies with both the Secretary's Standards (Standards 2, 3, 5, 6 and 9) and the local St. James Square Historic District Guidelines (including for

32

General Character, Fenestration, Detailing, and Color) by labeling them as "partially consistent." Despite the undisputed inconsistencies with applicable standards, the report concluded that because the Park as a "center focal point of the St. James Park Historic District" would continue to be used as "public open space," "the [P]roject is compatible with the Secretary['s Standards]." The report further noted the Project's preservation of "the historic palm trees along North First Street, the monuments, and most importantly, the historic focal point of the St. James Square Historic District, which is the landscaped character and spatial understanding of the park." It also concluded that the Project "preserves the park's location, use, [and] significant character-defining features[;] respects the historic design intent as a reinterpretation of St. James Park[;] differentiates the design from the original St. James Park design and represents modern materials and designs[;] and preserves the essential form and integrity of the park." The report thus recommended that the City Council deny the appeal because "[c]onsidering all relevant aspects of [S.J. Mun. Code] Section 13.48.240, the proposed design for the [Project], will not be detrimental to St. James Park or the St. James Square Historic District of which it is a part."

City Council Resolution No. 79848 reiterated much of the contents of the staff report, including the description of the Project inconsistencies with the Secretary's Standards as "partially consistent" and the deviations from the 1989 St. James Square Historic District Design Guidelines as "partially compliant." (Italics omitted.) It found that the Park had "already lost much of its historic integrity and quality that was associated with the park during most of the years of its period of historic significance. The [Project] preserves most of the significant character-defining features that remain a part of St. James Park. Further, the [P]roject maintains St. James Park as the focus of the

33

historic district through the diagonal pathways and rich plantings and preserves the landscaped character and spatial understanding of the park. [¶] Therefore, the [P]roject will not be detrimental to the St. James Square Historic District and is consistent with the spirit and purposes of the . . . Ordinance."[11] (Italics omitted.)

Findings supporting the cited lack of detriment to the St. James Square Historic District in Resolution No. 79848 restated what had been included in the Planning Director's issued permit, namely that the Project preserves the Park's location; preserves and continues its use as a community park; preserves the Park's significant character-defining features; relates to the Park's historic design intent as a reinterpretation of it; differentiates the design from the original design and represents modern materials and designs; and preserves the essential form and integrity of the property history and the design is reversible.

---

[11] City Council Resolution No. 79848 denying the appeal and approving the Historical Preservation permit issued by the Planning Director found that the Project would "not be detrimental to the St. James Square Historic District." Even within the contents of this Resolution, and contrary to respondents' argument, this described District appears to refer to the historic district as listed on the National Register of Historic Places, as distinguished from the locally designated St. James Square City Landmark Historic District. City Council Resolution No. 79848 made no additional finding that the Project would not be detrimental to the locally designated St. James Square City Landmark Historic District. Nor did it, unlike the Historic Preservation permit itself, make any finding that the Project would not be detrimental to St. James Park as a feature of significant architectural, cultural, historic, or aesthetic interest or value. But the permit issued by the Planning Director before the Resolution did make this specific finding, while not addressing detriment to a historic district. Read together, Resolution No. 79848 and the Historical Preservation permit it approved, covered both "detriment" prongs of the standard set at S.J. Mun. Code section 13.48.240.B. for the grant of a permit— that the work of a project will not be "detrimental to an historic district *or* to a structure or feature of significant architectural, cultural, historical, [or] aesthetic . . . interest or value." (Italics added.)

34

The Resolution further found that the Project and the issuance of the permit were consistent with the Historic Preservation Land Use policies of the General Plan. It approved the Historic Preservation permit subject to the same 25 conditions as listed in the Planning Director's permit and added a 26th.

None of the permit conditions eliminated the extent to which the Project was indisputably inconsistent with the Secretary's Standards or the 1989 St. James Square Historic District Design Guidelines. And none addressed the extent to which the Project's design would indisputably cause the further loss of the Park's character-defining features, thereby causing harm to the Park as an historical resource or feature of significant historical, cultural, or aesthetic interest or value, and threatening its historical integrity and status as a contributor to the St. James Square Historic District as listed on the National Register of Historic Places and the California Register of Historical Resources, and to the listed District itself.

II.    *Procedural Background*

The Foundation's petition pleaded two causes of action in administrative mandate under Code of Civil Procedure section 1094.5. The first alleged CEQA violations, including inadequacy of the EIR in certain respects and the lack of substantial evidence to support the City's finding of infeasibility of the Discovery Meadow alternative.[12] The second cause of action alleged that the City's issuance of the Historical Preservation permit under the Ordinance was unlawful because the Project "would damage existing historic elements and adversely impact the historic integrity of St. James Park and the St. James

_____

[12] The petition alleged several other CEQA violations that the trial court also rejected and that the Foundation does not raise on appeal. We therefore do not address these issues, which include the alleged failure of the final EIR to respond to comments. The Foundation's opening brief explains that on appeal, this issue is folded into its claims about the inadequacy of the EIR.

Park Historic District." The Petition sought relief in the form of set-aside of the EIR certification, Project approvals, and the Historic Preservation permit.

The City and real party in interest, Friends of Levitt Pavilion San Jose (collectively, respondents) answered the petition. After briefing and a hearing, the trial court issued its lengthy written decision denying the Foundation's petition.

As to the Foundation's claim that the Project is inconsistent with the General Plan designation of parks as " 'low intensity uses' " in that the events contemplated to be held at the Pavilion are anything but, the court concluded that this claim is not a CEQA issue, in reliance on *Highway 68 Coalition v. County of Monterey* (2017) 14 Cal.App.5th 883, 893 (*Highway 68*). The court alternatively rejected the claim because the CEQA Guidelines in any event require only a discussion of plan inconsistencies in the EIR, and no analysis is required when a project is consistent with the relevant plans. (*Highway 68*, at pp. 893–894.) The court noted that here, the City Council had determined, based on substantial evidence, that the Project was consistent with the General Plan. The court further cited that the EIR provided discussion as to this consistency with specific reference to the General Plan's Land Use and Planning elements as well as the applicable Zoning Ordinance. As to the Foundation's claim of Project inconsistency with the Historic Preservation Ordinance and the EIR's claimed inadequacy as to this, the court concluded that as a CEQA issue, the claim had not been exhausted as it had been raised only "outside of the EIR process," as the Foundation had conceded.

As to the issue of the EIR's claimed inadequacy in its treatment of the Discovery Meadow alternative as infeasible, the trial court concluded that not just the EIR but the City Council's findings in rejecting this alternative were supported by substantial evidence in the record. Specifically, the court noted,

the EIR said that Discovery Meadow would not meet *one* (Object 7) of the Project's main objectives—to transform an underutilized neighborhood park into a prime destination where music concerts occur. If the Pavilion were to be relocated to Discovery Meadow, which is not an underutilized park, then this objective would not be met.

But, as the trial court observed, the City Council cited in Resolution No. 79770 two other main Project objectives that would also not be met by the Discovery Meadow alternative. These were developing the Park as a cultural asset conducive to creating a thriving destination and building community through music (Object 5) and integrating arts and culture into the community to spark economic growth, drive community engagement, and enhance overall quality of life (Object 8). The City Council thus found that "[a]s the objectives (Object 5, 7, and 8) of this Project [are] to revitalize and transform an underutilized neighborhood park through a combination of physical and programmatic improvements (including through activation of musical events), this objective would not be met with the relocation of the [P]avilion to another site. Therefore, this alternative is rejected."

The court thus found the City's infeasibility finding as to the Discovery Meadow alternative to be supported by substantial evidence that the alternative would fail to meet three combined Project objectives. The alternative was identified and discussed in the EIR and, the court determined, the City as lead agency was within its discretion to reject this alternative as infeasible as failing to meet these objectives. The court found that taken together, these three objectives provide a " 'reasonable definition of [the Project's] underlying purpose,' " citing *In re Bay-Delta* (2008) 43 Cal.4th 1143, 1166 (*Bay-Delta*). The court rejected the Foundation's categorization of the identified Project objectives as " 'artificially narrow' " and as a cherry-picked reading of *Bay-Delta*. In so

doing, the court provided the following full quote from *Bay-Delta*: " 'Although the lead agency may not give a project's purpose an artificially narrow definition, a lead agency may structure its EIR alternative analysis around a reasonable definition of underlying purpose and need not study alternatives that cannot achieve that basic goal.' " (*Ibid.*) The court thus concluded on this issue that the City was "within its discretion to reject an alternative that would not further the revitalization of the [P]ark through music and the arts" and that the Foundation had failed to show otherwise.

As to the Foundation's claim that the City's Historic Preservation permit was issued in violation of the Ordinance, the trial court rejected this claim, concluding that the Foundation's proffered interpretation of S.J. Mun. Code section 13.48.240 was "not reasonable."[13] The court construed this section, in parallel to CEQA, as permitting the City to override a finding of detriment to be caused by the Project, and thus issue the Historic Preservation permit, if the Project's perceived benefits outweigh the detriment to an historical district or structure or feature of significant architectural, cultural, historical, or aesthetic value or interest. The court said, "It is not a reasonable interpretation of the Ordinance that any detriment at all should preclude an [Historical Preservation] permit where there are, as here, overriding considerations that justify CEQA approval despite significant and unavoidable adverse impact." The court thus viewed S.J. Mun. Code section 13.48.240 as "contemplate[ing] a balancing of 'detriment' through the process of imposing conditions" to the

_____

[13] Respondents argued below that this claim had not been administratively exhausted and that the Foundation lacked standing to raise it because the appeal of the Planning Director's Historical Preservation permit to the City Council was by the Sainte Claire Club, not the Foundation. The trial court rejected this argument and respondents do not assert it on appeal. We thus need not address it.

issuance of a permit, and not through a threshold balancing of project benefits against adverse impacts to arrive at a net result in assessing whether there is detriment, before the imposition of conditions. But the court's view was a rejection of the Foundation's argument that, as distinct from CEQA, the Ordinance required denial of a permit when there is uncontradicted evidence and findings of adverse impacts to an historical resource and the imposed conditions indisputably do not fully mitigate or eliminate those impacts.

In accordance with its written decision, the trial court entered judgment against the petitioner Foundation, which timely appealed.

DISCUSSION

I.    *No CEQA Violation Has Been Shown*

A.  CEQA Overview

CEQA "and the regulations implementing it ([Guidelines]) embody California's strong public policy of protecting the environment. 'The basic purposes of CEQA are to: [¶] (1) Inform governmental decision makers and the public about the potential, significant environmental effects of proposed activities. [¶] (2) Identify ways that environmental damage can be avoided or significantly reduced. [¶] (3) Prevent significant, avoidable damage to the environment by requiring changes in projects through the use of alternatives or mitigation measures when the governmental agency finds the changes to be feasible. [¶] (4) Disclose to the public the reasons why a governmental agency approved the project in the manner the agency chose if significant environmental effects are involved.' " (*Tomlinson v. County of Alameda* (2012) 54 Cal.4th 281, 285–286 (*Tomlinson*), quoting Guidelines, § 15002.)

"To achieve these goals, CEQA and the implementing regulations provide for a three-step process. In the first step, the public agency must determine whether the proposed development is a 'project,' that is, 'an activity which may

39

cause either a direct physical change in the environment' undertaken, supported, or approved by a public agency. (§ 21065.)" (*Tomlinson, supra*, 54 Cal.4th at p. 286.) If the proposed activity is a " 'project,' " the second step requires the public agency to decide whether it is exempt from compliance with CEQA under narrow circumstances. (*Ibid.*, citing §§ 21080, 21084, subd. (a); Guidelines, § 15300.) "If a project does not fall within a CEQA exemption, the lead agency conducts an initial study to determine whether the project may have a significant impact on the environment. (*Muzzy Ranch Co. v. Solano County Airport Land Use Com.* (2007) 41 Cal.4th 372, 380; [Guidelines, §§ 15063, subd. (a), 15002, subd. (k)(2).]" (*Ocean Street Extension Neighborhood Assn. v. City of Santa Cruz* (2021) 73 Cal.App.5th 985, 1002.)  "If the administrative record before the agency contains substantial evidence that the project may have a significant effect on the environment . . . it must go to the third stage of the CEQA process: preparation and certification of an EIR. (§§ 21100, 21151; Guidelines, §§ 15002, subd. (k)(3), 15063, subd. (b)(1), 15064, subds. (a)(1), (g)(1), 15362.)" (*Gentry v. City of Murrieta* (1995) 36 Cal.App.4th 1359, 1372.)

"As a general proposition, CEQA depends on the EIR. 'An environmental impact report is an informational document,' the purpose of which 'is to provide public agencies and the public in general with detailed information about the effect which a proposed project is likely to have on the environment; to list the ways in which the significant effects of such a project might be minimized; and to indicate alternatives to such a project.' (. . . § 21061.) According to our Supreme Court: 'The purpose of an EIR is to give the public and government agencies the information needed to make informed decisions, thus protecting " 'not only the environment but also informed self-government.' " [Citation.] The

40

EIR is the heart of CEQA, . . .' [Citation.]" (*Tiburon Open Space Committee v. County of Marin* (2022) 78 Cal.App.5th 700, 724–725, fn. omitted (*Tiburon*).)

" 'A public agency must prepare an EIR or cause an EIR to be prepared for any project that it proposes to carry out or approve that may have a significant effect on the environment. (. . . §§ 21100, subd. (a), 21151, subd. (a); Guidelines, § 15064, subd. (a)(1).) The EIR must describe the proposed project and its environmental setting, state the objectives sought to be achieved, identify and analyze the significant effects on the environment, state how those impacts can be mitigated or avoided, and identify alternatives to the project, among other requirements. (. . . §§ 21100, subd. (b), 21151; Guidelines, §§ 15124, 15125.)' " (*Tiburon, supra*, 78 Cal.App.5th at p. 725.)

" 'The agency must notify the public of the draft EIR, make the draft EIR and all documents referenced in it available for public review, and respond to comments that raise significant environmental issues. (. . . §§ 21091, subds. (a), (d), 21092; Guidelines, §§ 15087, 15088.) . . . It must prepare a final EIR including any revisions to the draft EIR, the comments received from the public and other agencies, and responses to comments. (Guidelines, §§ 15089, subd. (a), 15132.)' " (*Tiburon, supra*, 78 Cal.App.5th at p. 725.)

" 'An agency may not approve a project that will have significant environmental effects if there are feasible alternatives or feasible mitigation measures that would substantially lessen those effects. (. . . §§ 21002, 21002.1, subd. (b); Guidelines, § 15021, subd. (a)(2); [Citation].) An agency may find, however, that particular economic, social, or other considerations make the alternatives and mitigation measures infeasible and that particular project benefits outweigh the adverse environmental effects. (. . . § 21081, subds. (a)(3), (b); Guidelines, § 15091, subd. (a)(3).) Specifically, an agency cannot approve a project that will have significant environmental effects unless it finds as to each

41

significant effect, based on substantial evidence in the administrative record, that (1) mitigation measures required in or incorporated into the project will avoid or substantially lessen the significant effect; . . . or (3) specific economic, legal, social, technological, . . . or other benefits outweigh the significant environmental effects. (. . . §§ 21081, 21081.5; Guidelines, § 15091, subds. (a), (b).) A finding that specific overriding project benefits outweigh the significant environmental effects (. . . § 21091, subd. (b)) is known as a statement of overriding considerations. (Guidelines, § 15093.)" (*Tiburon, supra*, 78 Cal.App.5th at pp.725–726.)

" 'Thus, a public agency is not required to favor environmental protection over other considerations, but it must disclose and carefully consider the environmental consequences of its actions, mitigate adverse environmental effects if feasible, explain the reasons for its actions, and afford the public and other affected agencies an opportunity to participate meaningfully in the environmental review process. The purpose of these requirements is to ensure that public officials and the public are aware of the environmental consequences of decisions before they are made.' [Citation.]" (*Tiburon, supra*, 78 Cal.App.5th at p. 726.)

At the same time, "[t]oo much should not be expected of an EIR. It is not to have the exhaustive scope of scientific textbook. 'An EIR should be prepared with a sufficient degree of analysis to provide decisionmakers with information which enables them to make a decision which intelligently takes account of environmental consequences. An evaluation of the environmental effects of a proposed project need not be exhaustive, but the sufficiency of an EIR is to be reviewed in the light of what is reasonably feasible. . . . The courts have looked not for perfection but for adequacy, completeness, and a good faith effort at full disclosure.' (Guidelines, § 15151.)" (*Tiburon, supra*, 78 Cal.App.5th at p. 726.)

42

"Much of what goes into an EIR is left to the discretion of the agency preparing it. The leading treatise summarizes: 'The lead agency has discretion to design the EIR and need not conduct every recommended test or perform all required research. [Citations.] An EIR is not required to address all of the variations of the issues presented. [Citations.] An analysis of every permutation of the data is not required.' (1 Kostka & Zischke, Practice Under the California Environmental Quality Act (Cont.Ed.Bar 2d ed. 2022) § 11.28, pp. 11-19–11-20 [(Kostka & Zischke)]; see *Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 415 [] ['A project opponent . . . can always imagine some additional study or analysis that might provide helpful information. It is not for them to design the EIR. That further study . . . might be helpful does not make it necessary'].)" (*Tiburon, supra*, 78 Cal.App.5th at pp. 726–727.)

"The judicial attitude to EIRs is deferential. . . . It follows that courts 'do not require technical perfection or scientific certainty.' (*Sierra Club v. County of Fresno* (2018) 6 Cal.5th 502 515 (*Sierra Club*).)" (*Tiburon, supra*, 78 Cal.App.5th at p. 727, fn. omitted.) As noted, reviewing courts " ' " 'have looked not for an exhaustive analysis but for adequacy, completeness and a good-faith effort at full disclosure.' " ' [Citations.]" (*Sierra Club*, at p. 515; see Guidelines, § 15151 [sufficiency of EIR viewed in light of what is reasonably feasible].)

### B. The Standard of Review

"In general, judicial review of agency actions for CEQA compliance extends to 'whether there was a prejudicial abuse of discretion.' " (*Protecting Our Water & Environmental Resources v. County of Stanislaus* (2020) 10 Cal.5th 479, 495 (*Protecting Our Water*).) " '[A]n agency may abuse its discretion under CEQA either by failing to proceed in the manner CEQA requires or by reaching factual conclusions unsupported by substantial evidence. [Citation.]

43

Judicial review of these two types of error differs significantly: While we determine whether the agency has employed the correct procedure, "scrupulously enforc[ing] all legislatively mandated CEQA requirements" [citation], we accord greater deference to the agency's substantive factual conclusions,' " asking only whether they are supported by substantial evidence. (*Sierra Club, supra*, 6 Cal.5th at p. 512.)

" ' " ' "An EIR is presumed adequate," ' " ' " and the party challenging its adequacy " ' " ' "has the burden of proving otherwise" ' " ' " by establishing a " ' "prejudicial abuse of discretion." ' " (*South of Market Community Action Network v. City and County of San Francisco* (2019) 33 Cal.App.5th 321, 329 (*South of Market*); see *Neighbors for Smart Rail v. Exposition Metro Line Construction Authority* (2013) 57 Cal.4th 439, 463.)

" ' "A prejudicial abuse of discretion occurs if the failure to include relevant information precludes informed decisionmaking and informed public participation, thereby thwarting the statutory goals of the EIR process." ' " (*South of Market, supra*, 33 Cal.App.5th at p. 331; see also *Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 428 (*Vineyard*) [absence of information in an EIR may be a failure to proceed in a manner required by law under § 21061].) "But, failing to include information 'normally will rise to the level of a failure to proceed in the manner required by law only if the analysis in the EIR is clearly inadequate or unsupported. [Citation.]' [Citation.]" (*Citizens for a sustainable Treasure Island v. City and County of San Francisco* (2024) 227 Cal.App.4th 1036, 1046.) "A challenger . . . asserting inadequacies in an EIR must show the omitted information 'is both required by CEQA and necessary to informed discussion. [Citations.]' [Citation.]" (*Id.* at pp. 1046–1047.) " 'Only if the manner in which an agency failed to follow the law is shown to be prejudicial, or is presumptively

44

prejudicial, as when the [lead agency] fails to comply with mandatory procedures, must the decision be set aside . . . .' [Citation.]" (*Environmental Protection Information Center v. California Department of Forestry & Fire Protection* (2008) 44 Cal.4th 459, 485.) The failure to comply with mandatory procedures gives rise to presumptive prejudice when the result is a subversion of CEQA's purposes; for example, if the absence of information frustrated public comment or made meaningful assessment of potentially significant environmental impacts impossible. (*Id.* at pp. 485–486.)

Judicial review for a claimed failure to proceed in the manner required by CEQA, on the one hand, or for reaching factual conclusions unsupported by substantial evidence, on the other hand, "differs significantly: [w]hile we determine de novo whether the agency has employed the correct procedures, 'scrupulously enforc[ing] all legislatively mandated CEQA requirements' [citation], we accord greater deference to the agency's substantive factual conclusions." (*Vineyard, supra,* 40 Cal.4th at p. 435.) "These differences require the 'reviewing court [to] adjust its scrutiny to the nature of the alleged defect, depending on whether the claim is predominantly one of improper procedure or a dispute over the facts.' (*Vineyard, supra*, 40 Cal.4th at p. 435.; accord, *Sierra Club, supra*, 6 Cal.5th at p. 512 [recognizing 'a procedural issues/factual issues dichotomy' with respect to the CEQA standard of review].) Consistent[ly] with the differentiated standards stated above, we independently review the administrative record for ' "any legal error" by the agency and deferentially consider[] whether the record "contains substantial evidence to support [the agency's] factual determinations." ' (*Protecting Our Water, supra,* 10 Cal.5th at p. 495; see *Sierra Club*, [*supra*, 6 Cal.5th] at p. 512.)" (*Preservation Action Council v. City of San Jose* (2023) 91 Cal.App.5th 517, 532 (*Preservation*).) Under CEQA, "[s]ubstantial evidence shall include facts, reasonable

45

assumptions predicated on facts, and expert opinion supported by facts." (§ 21082.2, subd. (c); see also Guidelines, § 15064, subd. (f)(5).) It does not include "argument, speculation, unsubstantiated opinion or narrative, evidence which is clearly inaccurate or erroneous, or evidence of social or economic impacts which do not contribute to, or are not caused by, physical impacts on the environment." (§ 21082.2, subd. (c); see also Guidelines, § 15064, subd. (f)(5).)

But "the distinction between de novo and substantial evidence review 'is not always so clear.' [Citation.] The Supreme Court acknowledged this difficulty in *Sierra Club*. It explained that while 'there are instances where the agency's discussion of significant project impacts may implicate a factual question that makes substantial evidence review appropriate' ([*Sierra Club, supra*, 6 Cal.5th] at p. 514), courts 'have consistently recognized that adequacy of discussion claims are not typically amenable to substantial evidence review.' (*Id.* at p. 515.) That is, '[t]he determination whether a discussion is sufficient is not solely a matter of discerning whether there is substantial evidence to support the agency's factual conclusions.' (*Id.* at p. 516.) Rather, '[t]he ultimate inquiry . . . is whether the EIR includes enough detail "to enable those who did not participate in its preparation to understand and to consider meaningfully the issues raised by the proposed project." ' (*Ibid.*) That inquiry, which presents a mixed question of law and fact, 'is generally subject to independent review.' (*Ibid.*)" (*Preservation, supra*, 91 Cal.App.5th at pp. 532–533, citing *Sierra Club, supra*, at p. 516.) Still, "underlying factual determinations—including, for example, an agency's decision as to which methodologies to employ for analyzing an environmental effect—may warrant deference. [Citations.] Thus, to the extent a mixed question requires a determination whether statutory criteria were satisfied, de novo review is appropriate; but to the extent factual

questions predominate, a more deferential standard is warranted. [Citation.]" (*Sierra Club, supra*, 6 Cal.5th at p. 516.)

The Foundation urges, with no cited authority, that because of *Sierra Club*'s explication as to the dual standard of review to be applied to claims of EIR inadequacy, with many such claims receiving independent judicial review, years of appellate precedent that afforded an initial presumption of EIR adequacy is irrelevant and now erroneous. The Foundation presumes that conducting independent review and respecting a presumption of correctness are mutually exclusive concepts. Not so. As an example, it is a basic tenet of appellate review that a judgment is presumed correct, even when it is reviewed independently or de novo. (*Meridian Financial Services Inc. v. Phan* (2021) 67 Cal.App.5th 657, 708.) The same logic applies here. Even if the Foundation's claims as to EIR inadequacy are subject to independent review, the EIR is still presumed correct and it is up to the challenger Foundation to show otherwise.

An agency's infeasibility findings, as challenged here as to the Discovery Meadow alternative, will be upheld if supported by substantial evidence. (*California Native Plant Society v. City of Santa Cruz* (2009) 177 Cal.App.4th 957, 997 (*Native Plant*).) These findings are entitled to great deference and " 'are presumed correct. The parties seeking mandamus bear the burden of proving otherwise, and the reviewing court must resolve reasonable doubts in favor of the administrative findings and determination.' [Citation.]" (*Ibid.*)

### C. No CEQA Violation is Shown as to Claims of Plan Inconsistency

The Foundation claims, in bare and conclusory fashion and without analysis, that the EIR "failed to study" the Project's asserted inconsistency with "any applicable land use plan, policy, or regulation of an agency adopted to avoid or mitigate an environmental effect," as provided by Guidelines, Appendix G, section XI. The identified plan, policy, or regulations cited are the City's

General Plan designation of Open Space, Park & Habitat, which is intended for low intensity uses, and the Historic Preservation Ordinance.

The Foundation asserts that this claim is *not* one of inconsistency raised under the Government Code, a non-CEQA claim, but is instead properly raised under CEQA and addressed under the fair argument standard. (See e.g., *Pocket Protectors v. City of Sacramento* (2004) 124 Cal.App.4th 903, 929–934 [CEQA fair argument test applies to inconsistency claims that a project conflicts with an applicable land use plan, policy, or regulation *adopted for the purpose of avoiding or mitigating an environmental effect*].) But in *Highway 68*, relied on by the trial court here, this court concluded that the "issue of whether a proposed project is consistent with [a] general plan is not a CEQA issue." (*Highway 68, supra*, 14 Cal.App.5th at p. 893.) The court acknowledged that Guidelines, section 15125, subdivision (d), requires that an EIR "discuss any inconsistencies between the proposed project and applicable general plans, specific plans, and regional plans." But that mandate does not require analysis in an EIR if the project *is* consistent with the relevant applicable plans; only inconsistencies must be identified and discussed. (*Highway 68, supra*, 14 Cal.App.5th at p. 896; *Pfeiffer v. City of Sunnyvale* (2011) 200 Cal.App.4th 1552, 1566.) Moreover, Guidelines, section 15125, subdivision (d) does not require the EIR to resolve any such inconsistencies. (Kostka & Zischke, Practice Under the Cal. Environmental Quality Act (Cont.Ed.Bar 2017) Project Description, Setting and Baseline, § 12:34.)

As to the claim of inconsistency with the General Plan's designation for Open Space, Park & Habitat, the Foundation, as it did in the trial court, merely makes the conclusory and unanalyzed allegation of inconsistency.

Respondents rightly point out on this issue that the EIR evaluated the potential effects of the Project in the environmental factors category of Land

Use/Planning, in compliance with Guidelines, Appendix G, § XI. The EIR identified five General Plan policies and the City's Zoning Ordinance as the City's regulatory framework for the discussion. The EIR also discussed whether the Project would cause a significant impact due to a conflict with any land use plan, policy, or regulation adopted for the purpose of avoiding or mitigating an environmental effect and concluded there was consistency and any effect of the project would be less than significant. The discussion included that the Park would continue functioning as a park and venue for events that are open to the public and that its renovation would "facilitate improved livability and social and environmental quality of the downtown area." It added that the Project would "maintain the existing park use (passive park uses and events) and have additional programmatic events at the performing arts pavilion" and that park uses are permitted under current zoning, although the Project proposes to allow commercial uses, which may require an event or development permit.

As further pointed out by respondents, and as relevant to both of the Foundation's inconsistency claims, in its section on Cultural Resources, the EIR also considered and discussed several additional regulatory framework items: the National Historic Preservation Act, the California Register of Historical Resources, the Secretary's Standards, the Public Resources Code, the California Code of Regulations, the Health and Safety Code, numerous other relevant policies of the General Plan specific to cultural resources, the Ordinance, the City's Development Policy on the Preservation of Historic Landmarks, the St. James Square Historic District Design Guidelines, and the 2004 Draft San Jose Downtown Historic Design Guidelines.

The EIR also addressed existing conditions on the site and provided analysis of the Project's acknowledged inconsistencies with the Secretary's Standards and the St. James Square Historic District Design Guidelines,

49

concluding that the Project would impact the historic integrity of the Park and the St. James Square Historic District, resulting in significant and unavoidable impacts. This EIR analysis was based on the detailed Archives & Architecture LLC historic reports contained in the EIR's Appendix D. These reports also included discussion of the Ordinance, the Historic Preservation permit, and the applicable General Plan Land Use policies.

In its inconsistency argument on appeal, the Foundation does not cite to or discuss any of these portions of the administrative record. As to general plan inconsistency, it does not explain why or how the EIR discussion on these topics is insufficient or in what specific way "low intensity uses" exclude uses contemplated by the Project. It is the Foundation's burden on appeal to show an abuse of discretion by establishing EIR inadequacy, and it has failed to do so on its claim of general plan inconsistency in the land use designation of Open Space, Park & Habitat.

The same is true of the Foundation's claim of EIR inadequacy due to the Project's asserted inconsistency with the Ordinance. Its claim of inconsistency here—made in a single paragraph consisting of two sentences—offers even less articulation, argument, and analysis.[14] And the claim does not appear to have been raised during the administrative process leading to EIR certification and Project approval, instead only outside the EIR process. The claim thus fails administrative exhaustion requirements, on top of the Foundation's failure to substantively meet its burden on appeal on its inconsistency claims as framed under CEQA.

---

[14] The Foundation offers nothing further and no response to the respondents' brief on its CEQA claims, opting in its reply brief to rely "in full on the opening brief's CEQA discussion and record citations" such as they are.

50

D. <u>The City's Infeasibility Finding as to the Discovery Meadow Alternative is Supported by Substantial Evidence</u>

The Foundation generally contends by argument heading that the "City's CEQA Findings are Unsupported" but it provides argument only as to the infeasibility finding of the Discovery Meadow Project alternative, contending the finding is not supported by substantial evidence and that "there is no factual basis . . . that Discovery Meadow is an infeasible location for the Levitt Pavilion."

It is the "policy of the state that public agencies should not approve projects as proposed if there are feasible alternatives or feasible mitigation measures available which would substantially lessen the significant environmental effects of such projects." (§ 21002.) " 'Feasible' means capable of being accomplished in a successful manner within a reasonable period of time, taking into account economic, environmental, social, and technological factors." (§ 21061.1; Guidelines, § 15364.) But "[i]n the event specific economic, social, or other conditions make infeasible such project alternatives or such mitigation measures, individual projects may be approved in spite of one or more effects thereof. (§ 21002.) If an EIR identifies significant effects on the environment that would occur if the project is approved, the lead agency shall not approve the project unless it makes written findings as to each effect that the impacts have been mitigated or that specific economic, legal, social, technological, or other considerations make the alternatives infeasible. (§ 21081, subd. (a)(1) & (3); Guidelines, § 15091.)

Section 21081, subdivision (a) thus " 'contains a "substantive mandate" requiring public agencies to refrain from approving projects with significant environmental effects if "there are feasible alternatives or mitigation measures" that can substantially lessen or avoid those effects.' [Citations.] Subdivision (b)

of section 21081, which 'codifies an "override" requirement and comes into play where the lead agency has issued an infeasibility finding under section 21081[, subdivision] (a)(3)' [citations], allows the lead agency to approve the project if it 'finds that specific overriding economic, legal, social, technological, or other benefits of the project outweigh the significant effects on the environment' (§ 21081)." (*Uphold Our Heritage v. Town of Woodside* (2007) 147 Cal.App.4th 587, 597, fn. omitted; see *County of Butte v. Department of Water Resources* (2022) 13 Cal.5th 612, 627–628.)

In addition to these required findings, an EIR must identify not every, but a range of reasonable alternatives to the project, which would feasibly attain most of the basic project objectives yet would avoid or substantially lessen any of the significant effects. And it must evaluate the comparative merits of the alternatives. The range must foster informed decisionmaking and public participation. The rule of reason controls the agency's selection of the nature and scope of alternatives to be discussed. (Guidelines, § 15126.6, subd. (a).)

"When assessing feasibility in connection with an alternatives analysis in the EIR, the question is whether the alternative is *potentially* feasible. [Citations.]" (*Native Plant, supra,* 177 Cal.App.4th at p. 999.) "While it is up to the EIR preparer to identify alternatives as potentially feasible, the decisionmaking body 'may or may not reject those alternatives as being infeasible' when it comes to project approval. [Citation.]" (*Ibid.*) "Like mitigation measures, potentially feasible alternatives 'are suggestions which may or may not be adopted by the decisionmakers.' [Citations.]" (*Ibid.*) "When it comes time to decide on project approval, the public agency's decisionmaking body evaluates whether the alternatives are *actually* feasible. [Citations.]" (*Ibid.*) "At this final stage of project approval, the agency considers whether '[s]pecific

economic, legal, social, technological, or other considerations . . . make infeasible the mitigation measures or alternatives identified in the [EIR].' (§ 21081, subd. (a)(3).)" (*Id*. at p. 1000.)

"Broader considerations of policy thus come into play when the decisionmaking body is considering actual feasibility than when the EIR preparer is assessing potential feasibility of the alternatives." (*Native Plant*, *supra*, 177 Cal.App.4th at p. 1000.) An agency may reject an alternative as infeasible under section 21081, subdivision (a)(3) on policy grounds because the alternative fails to achieve what the agency regards as primary objectives of the proposed project or plan. (*Native Plant*, at p. 1000) An alternative that is " 'impractical or undesirable from a policy standpoint' may be rejected as infeasible. [Citation.] Additionally, an alternative 'may be found infeasible on the ground it is inconsistent with the project objectives as long as the finding is supported by substantial evidence in the record.' [Citation.]" (*Id*. at p. 1001.)

As noted, the EIR here evaluated project alternatives, including the Discovery Meadow alternative that would, in essence, delete the Pavilion from the Project site and move it to a different downtown location. According to the record, Discovery Meadow is of similar size as the Park but it is not located within a historic district and it is currently and regularly used for outdoor events drawing significantly higher numbers of people than the Park has in recent years—it is not underutilized. It is also not located near sensitive noise receptors. The EIR concluded and the City found that moving the Pavilion to this location but otherwise implementing the Project at St. James Park would reduce the significant but unavoidable noise impacts and would avoid the Project's impacts to a historic resource. But it would not "guarantee that the relocation of the [P]avilion would fully reduce [the impact to] historic resources

to the St. James Project location as other components of the park" remain part of the existing Project.

As noted, the Discovery Meadow alternative was found by the City to meet "most of the Project objectives (by revitalizing St James Park and providing a performing arts pavilion, though at a different location from the Project), except *one* main objective [Object 7] that specifies transforming an underutilized neighborhood park into a prime destination *where music concerts occur*." (Italics added.) And this was supported by cited data showing that Discovery Meadow is not underutilized.

The Foundation emphasizes here that just "*one main objective*" of the Project was described as not being met by this alternative and challenges as unsupported that this Project goal could be considered "main." But, as the trial court found, the City's finding of infeasibility of this alternative, as expressed in Resolution No. 79770, also referenced two other Project Objects—5 and 8—as not being met by the Discovery Meadow alternative. It is apparent that the finding's actual descriptor of the single unmet Project goal includes these other two. As provided in the EIR, Object 5 states "[d]evelop a cultural asset conducive to creating a thriving destination and building community through music." Object 8 states "[i]ntegrate arts and culture into the community to spark economic growth, drive community engagement, and enhance overall quality of life." Thus, the City Council's infeasibility finding as to this alternative incorporated all three listed Project goals that would go unmet.

As argued by respondents, the Project's main purpose is not just to have a venue for music concerts. Its underlying purpose, as expressed in these three combined objectives, includes using physical and programmatic improvements to create a cultural asset, integrating arts and culture into the community, transforming an underutilized neighborhood park into a thriving and prime

54

destination, building the community through musical events, and sparking economic growth by the integration of arts and culture. These fundamental Project goals would not be met by simply deleting the Pavilion from the Project site and moving it to Discovery Meadow, as this alternative describes.

The Foundation's specific contention is that in rejecting the Discovery Meadow alternative as infeasible, the City provided an "artificially narrow definition" of the Project's " 'underlying fundamental purpose' " as addressed in *Bay-Delta*. The Supreme Court in that case observed that the "process of selecting the alternatives to be included in the EIR begins with the establishment of project objectives by the lead agency. 'A clearly written statement of objectives will help the lead agency develop a reasonable range of alternatives to evaluate in the EIR and will aid the decision makers in preparing findings . . . . The statement of objectives should include the underlying purpose of the project.' ([Guidelines,] § 15124, subd. (d).)" (*Bay-Delta, supra*, 43 Cal.4th at p. 1163.) "Although a lead agency may not give a project's purpose an artificially narrow definition, a lead agency may structure its EIR alternatives around a reasonable definition of underlying purpose and need not study alternatives that cannot achieve that basic goal. For example, if the purpose of the project is to build an oceanfront hotel [citation], or a waterfront aquarium [citation], a lead agency need not consider inland locations. [Citation.]" (*Id.* at p. 1166.) Further, deletion and relocation of just the Pavilion to Discovery Meadow, as the Foundation proposes, does not amount to an alternative location for the Project under CEQA Guidelines section 15126.6, subdivision (a), which describes the scope of an alternatives analysis, but only one of the Project's components. The City was not even required under CEQA to consider this alternative, let alone rest a feasibility finding on it. (See *Yerba Buena Neighborhood Consortium, LLC, et al. v.*

*Regents of the University of California* (2023) 95 Cal.App.5th 779, 797–799 (*Yerba Buena*); *Native Plant, supra*, 177 Cal.App.4th at pp. 992–994 [requirement of alternatives to proposed project is applicable only to project as a whole, not to its various facets].)

The Foundation does not articulate how or why the Project's combined objectives 5, 7, and 8, as expressed in the City's infeasibility finding, together do not constitute a reasonable definition of an underlying Project purpose. (See *Yerba Buena, supra*, 95 Cal.App.5th at p. 798 [reasonable reading of project's " 'fundamental purpose' " by consideration of its multiple listed objectives may defeat feasibility of proposed alternative].) As the trial court here observed in its decision, which remains true on appeal, the Foundation, while acknowledging that the feasibility of an alternative is a substantial evidence question, does not even mention Objects 5 and 8 in failing to grapple with the City's actual infeasibility finding as to this alternative or the actual record supporting this finding. And it fails to address the record evidence showing that Discovery Meadow, unlike St. James Park, is *not* an underutilized neighborhood park. As the City Council found, "[e]ven with fewer events, the Discovery Meadow offers different scales of events and encourage[s] more attendance per event. For example, in 2018-2019, St. James Park ha[d] a total of 156 events with a total of 19,062 attendees while Discovery Meadow ha[d] a total of 23 events with a total of 182,980 attendees." The Foundation does not challenge this data. Nor could it on this record. This number and scale of attendees at Discovery Meadow events alone shows that this site is not "an underutilized neighborhood park" that one of the Project's stated objectives is intended to address. And the described alternative would altogether remove the music and events venue from the Project, thus defeating other aspects of its underlying

56

stated purposes or goals. The City's analytical route to its infeasibility finding is thus charted and clear, contrary to the Foundation's claim.

The Foundation attacks the City's infeasibility finding as to the Discovery Meadow alternative as unsupported. But the Foundation has failed to describe all the material evidence in support of the finding and to explain why it is inadequate. This is fatal to the Foundation's substantial-evidence challenge. (*King & Gardiner Farms, LLC v. County of Kern* (2020) 45 Cal.App.5th 814, 850–851 [appellant making CEQA challenge for insufficient evidence must lay out the evidence favorable to the other side and show why it is lacking; appellant cannot carry its burden of showing error on appeal if it fails to do so].) As made, the Foundation's challenge is nothing "more than a 'policy disagreement with the City.' [Citation.]" (*Native Plant, supra*, 177 Cal.App.4th at p. 1001.) "[I]t is wholly improper for us to 'arrogate to ourselves a policy decision which is properly the mandate of the City.' [Citation.]" (*Id.* at p. 1002.)

Further, the Foundation's concept of feasibility is too narrow. Feasibility is "broadly defined" under CEQA and it is considered based on a project as proposed, complete with its stated objectives and component parts. (*Yerba Buena, supra*, 95 Cal.App.5th at p. 809.) "An EIR is not required to adopt a mitigation measure or alternative simply because doing so would reduce a significant impact. After all, it is always possible to eliminate a project's significant environmental effects by cancelling whatever aspect of the project causes that environmental effect." (*Ibid*.) In sum, there is substantial evidence in the record of the infeasibility of the Discovery Meadow alternative, given the Project's goals and objectives, reasonably read. Under CEQA, the City was ultimately entitled to make its infeasibility determination as a policy judgment to which we defer, if supported in the record, as it is here. (*Ibid.*; *Native Plant,*

*supra*, 177 Cal.App.4th at p. 1001 [alternative that is impractical or undesirable from policy standpoint may be rejected as infeasible].)

The Foundation has failed to show any legal infirmity either in the EIR's description of the Project's objectives or purposes or in the City Council's infeasibility finding as to the Discovery Meadow alternative, which is supported by substantial evidence in the record. We therefore reject the challenge.

II.     *The Issuance of the Historical Preservation Permit, on This Record,*
        *Was in Violation of the Ordinance*

The Foundation's primary challenge on appeal is to the City's issuance of an Historical Preservation permit for the Project under the Ordinance, specifically S.J. Mun. Code section 13.48.240. This is not a CEQA issue, but the City's environmental review process for the Project, including the City's ultimate CEQA findings and the Project EIR, are relevant to its determination. Indeed, the EIR was expressly generated with various discretionary approvals in mind, including for a permit under the Ordinance. And the EIR and Project certification and approval were considered at every step of the administrative process leading to the issuance of the permit under the Ordinance, including the City Council's final and ultimate approval of the Planning Director's administrative decision to grant the Historical Preservation permit for the Project by denying the appeal of that decision.[15]

A. Standard and Framework of Our Review

This claim, challenging a decision that is quasi-judicial in nature, is subject to review in administrative mandate under Code of Civil Procedure

_____

[15] Respondents contended below that this claim was not administratively exhausted and the Foundation lacked standing, as the administrative appeal of the Planning Director's issuance of the permit was brought by the St. Claire Club, different from the Foundation. The trial court rejected this contention and respondents do not raise it on appeal.

section 1094.5 after, under the Ordinance, a hearing was required to be given, evidence was required to be taken, and discretion in the determination of facts was vested in the agency. (*Bunnett v. Regents of University of California* (1995) 35 Cal.App.4th 843, 848.) Abuse of discretion is established if the agency has not proceeded in the manner required by law, the decision is not supported by the findings, or the findings are not supported by substantial evidence in the light of the whole record. (Code Civ. Proc., § 1094.5, subds. (b), (c).)

The Foundation challenges the City's interpretation and application of the Ordinance in issuing the Historical Preservation permit for the Project. We place the challenge in the context of Code of Civil Procedure section 1094.5—a claimed failure to proceed in the manner required by law, a claim that the decision to approve the permit under the Ordinance is not supported by the findings, and a claim that contrary findings are not supported by substantial evidence.

The first aspect of the challenge involves construction and interpretation of the Ordinance. "In interpreting municipal ordinances, we exercise our independent judgment as we would when construing a statute. [Citation.]" (*Berkeley Hills Watershed Coalition v. City of Berkeley* (2019) 31 Cal.App.5th 880, 896 (*Berkeley Hills*).)

" ' " ' "As in any case involving statutory interpretation, our fundamental task here is to determine the [drafter's] intent so as to effectuate the law's purpose. [Citation.] We begin by examining the statute's [or ordinance's] words, giving them a plain and commonsense meaning." ' " ' [Citation.] ' "[W]e look to 'the entire substance of the statute in order to determine the scope and purpose of the provision . . . . [Citation.]' [Citation.] That is, we construe the words in question ' "in context, keeping in mind the nature and obvious purpose of the statute . . . ." [Citation.]' [Citation.] We must harmonize the various parts of a

59

statutory enactment . . . by considering the particular clause or section in the context of the statutory framework as a whole." ' " ' [Citation.]" (*People v. Venice Suites, LLC* (2021) 71 Cal.App.5th 715, 727 (*Venice Suites*); see also *Hassan v. Mercy American River Hospital* (2003) 31 Cal.4th 709, 715 [well-established rules of statutory construction require courts to ascertain intent of enacting legislative body]; *Riddick v. City of Malibu* (Feb. 1, 2024, No. B323731) ___ Cal.App.5th ___ [2024 Cal.App. LEXIS 118, *19–*21] (*Riddick*).)

"If the statutory language is susceptible of more than one reasonable interpretation, the courts look to 'extrinsic aids, including the ostensible objects to be achieved, the evils to be remedied, the legislative history, public policy, contemporaneous administrative construction, and the statutory scheme of which the statue is a part. [Citations.]' [Citation.] We interpret the statute using ' "reason, practicality, and common sense to the language at hand." [Citation.]' [Citation.] We must give words of the statute a workable and reasonable interpretation. [Citation.]" (*Venice Suites, supra*, 71 Cal.App.5th at p. 727; see also *Riddick, supra*, ___ Cal.App.5th at p. ___ [2024 Cal.App. LEXIS 118 at pp. *19–*21].)

One such extrinsic aid when construing a municipal law that is susceptible of more than one reasonable interpretation is the city's interpretation of its own ordinance. (*Symons Emergency Specialties v. City of Riverside* (2024) 99 Cal.App.5th 583, 593, & fn. 5 (*Symons*).) Though not to the exclusion of other tools of statutory construction, "a city's interpretation of its own ordinance ' "is entitled to great weight unless it is clearly erroneous or unauthorized." ' [Citation.] In determining what weight to give an agency's interpretation of its own regulations, we apply the 'complex of factors' set forth by our Supreme Court in *Yamaha Corp. of America v. State Board of Equalization* (1998) 19 Cal.4th 1, 12 (*Yamaha*) [weight to be given an agency's

interpretation is 'fundamentally situational'].) Greater deference is accorded an agency's interpretation where ' "the agency has expertise and technical knowledge, especially where the legal text to be interpreted is . . . entwined with issues of fact, policy, and discretion[,] . . . since the agency is likely to be intimately familiar with regulations it authored and sensitive to the practical implications of one interpretation over another." ' (*Ibid.*) Deference is also appropriate when there are indications the agency's interpretation is likely to be correct. (*Id.* at pp. 12–13.)" (*Berkeley Hills, supra,* 31 Cal.App.5th at p. 896; see also *Riddick, supra*, ___ Cal.App.5th at p. ___ [2024 Cal.App. LEXIS 118 at pp. *20–*24] [discussing and applying *Yamaha* factors on question of deference to City's interpretation of its own ordinance after administrative process culminating in city council action]; see also *Symons, supra,* 99 Cal.App.5th at pp. 593–595 & fn. 5 [city's interpretation of own ordinance is entitled to deference and given great weight in a court's independent review of its meaning and application, unless the interpretation is arbitrary, capricious, or lacking any rational basis or is clearly erroneous or unauthorized].) But in the end, a " 'court has the duty " ' "to state the true meaning of the statute finally and conclusively" ' notwithstanding the [municipal] agency construction." ' " (*Berkeley Hills, supra,* 31 Cal.App.5th at p. 896, fn. 10.)

Beyond that, the Foundation's challenge to the City's approval of the Historical Preservation permit invokes our review for substantial evidence in light of the whole record.

### B. The Ordinance

As noted, San Jose's Historic Preservation Ordinance is set out at chapter 13.48 of the S.J. Mun. Code. It begins at Part 1 with a statement of its purpose and declaration of policy at S.J. Mun. Code section 13.48.010.

The policy (at subdivision A.) states that "to promote the economic and general welfare" and "to ensure the harmonious, orderly and efficient growth and development of the municipality, it is deemed essential . . . that the qualities relating to the history of" San Jose and "a harmonious outward appearance of structures which preserve property values and attract tourists and residents alike be preserved; some of these qualities are the continued existence and preservation of historic districts and landmarks; continued construction of structures in the historic styles and a general harmony as to style, form, color, proportion, texture and material between buildings of historic design and those of more modern design; that such purpose is advanced through the preservation and protection of the old historic or architecturally worthy structures and neighborhoods which impart a distinct aspect to the City of San José and which serve as visible reminders of the historical and cultural heritage of the City of San José, the state, and the nation."

S.J. Mun. Code section 13.48.010.B. explains that the Ordinance's purpose is "to promote the public peace, health, safety and welfare through the preservation of landmarks and districts and thereby stabilize neighborhoods and areas of the city; enhance, preserve and increase property values; carry out the goals and policies of the city's general plan[;] increase cultural, economic and aesthetic benefits to the city and its residents; preserve, continue and encourage the development of the city to reflect its historical, architectural, cultural, and aesthetic value or tradition; protect and enhance the city's cultural and aesthetic heritage; and promote and encourage continued private ownership and utilization of such structures."

S.J. Mun. Code section 13.48.020 contains definitions of terms as used in the Ordinance. As stated in subdivision A.: "The term 'historical, architectural, cultural, aesthetic, or engineering interest or value of an historical nature' shall

62

mean *a quality that derives from, is based upon, or related to any of the following factors:* [¶] *1. Identification or association with persons, eras or events that have contributed to local, regional, state or national history, heritage or culture in a distinctive, significant or important way*; [¶] 2. Identification as, or association with, a distinctive, significant or important work or vestige: [¶] a. *Of an architectural style, design or method of construction*; [¶] b. Of a master architect, builder, artist or craftsman; [¶] c. Of high artistic merit; [¶] d. *The totality of which comprises a distinctive, significant or important work or vestige whose component parts may lack the same attributes*; [¶] e. *That has yielded or is substantially likely to yield information of value about history, architecture, engineering, culture or aesthetics, or that provides for existing and future generations an example of the physical surroundings in which past generations lived or worked*; or [¶] f. That the construction materials or engineering methods used in the proposed landmark are unusual or significant or uniquely effective." (Italics added.)

The term "[h]istoric district" under S.J. Mun. Code section 13.48.020.B. is *not* confined to a locally designated district but is more broadly defined as "a geographically definable area of urban or rural character, possessing a significant concentration or continuity of site, building, structures or objects unified by past events or aesthetically by plan or physical development." "Landmark," as defined at S.J. Mun. Code section 13.48.020.C., includes a "site or portion thereof."

Under S.J. Mun. Code section 13.48.020.D., the "term 'preservation' shall mean the protection, conservation, enhancement, perpetuation, rehabilitation, restoration, repair, reconstruction, or other action taken to repair, conserve or prevent the deterioration or destruction or removal of a landmark or property in a historic district."

63

Part 3 of the Ordinance concerns Historic Preservation permits. S.J. Mun. Code section 13.48.210.A. provides that no "person shall perform any work or cause any work to be performed on a *city* landmark or in a *city* historic district except in compliance with . . . this chapter and pursuant to and in compliance with the terms and conditions of a permit issued thereunder . . . ." (Italics added.) Thus, as pertains to "historic districts," the City in enacting the Ordinance knew how to qualify these designations as local—versus a national or state designated historic district—when it wanted to. The requirement of an Historical Preservation permit is thus expressly limited to work performed on a city landmark or in a city-designated historical district.

S.J. Mun. Code section 13.48.240.A. provides that in "taking action on an application for an [Historical Preservation] permit, the director or the planning commission, or the city council, as applicable, shall consider the comments and recommendations of the historic landmarks commission as well as hear and consider all evidence presented to them or it at the public hearings. [They] shall also consider, among other things, the purposes of this chapter, the historic architectural value and significance of the landmark or of the district, the texture and material of the building or structure in question or its appurtenant fixtures, including signs, fences, parking, site plan, landscaping, and the relationship of such features to similar features of other buildings within an historic district, and the position of such buildings within an historic district, and the position of such building or structure in relation to the street or public way and other buildings or structures."

S.J. Mun. Code section 13.48.240.B. provides the standard for the issuance of an Historical Preservation permit. It says, "If the director or the planning commission or the city council, as applicable, finds that, *subject to such conditions as they may impose, the work **will not be detrimental** to an*

64

*historic district or to a structure or feature of significant architectural*, *cultural*, *historical, aesthetic*, or engineering *interest or value* **and** *is consistent with the spirit and purposes of this chapter*, [they] shall issue such [Historical Preservation] permit subject to such conditions as they deem reasonably necessary to secure the purposes of this chapter." (Italics & boldface added.) Thus, the imposition of conditions to the issuance of a permit may operate to mitigate harm to the point that it is not found or perceived to be "detrimental."

Conversely, S.J. Mun. Code section 13.48.240.C. provides, as relevant here, that if the Planning Director or the City Council "finds that the work **will be detrimental** to an *historic district* or to a structure *or feature of significant architectural*, *cultural, historical, aesthetic* or engineering *interest or value or* is inconsistent with the purpose of this chapter, **despite any conditions** that [they] may impose, [they] shall deny such [Historic Preservation] permit . . . ." (Italics and boldface added.) Thus, if the work of a project is still "detrimental," within the meaning of this section, after taking into account mitigating conditions to the issuance of a permit, the permit must be denied.

There is no language equivalent in the Ordinance to CEQA's statement of overriding considerations (set out at sections 21081 and 21081.5), which provides for an agency's acknowledgment and acceptance of significant impacts that cannot be fully and feasibly mitigated, and allows the agency's discretionary policy choice, in the end, to approve the project anyway because its specific benefits are expressly determined to outweigh its significant environmental effects. CEQA's statement of overriding considerations is structurally, analytically, and substantively distinct. But as we discuss below, this does not necessarily mean that under the Ordinance, discretion or policy judgments or values do not infuse or color how "detriment," or its extent, may be assessed or determined or whether a "structure or feature" of "architectural,

65

cultural, historical, or engineering interest or value" is "significant." (S.J. Mun. Code § 13.48.240.)

"[H]istoric district" as used in S.J. Mun. Code section 13.48.240—as the object of detriment that may be found—is notably not limited to a *local* or *city designated* district. This contrasts with section 13.48.210.A., which limits the scope of the permit requirement to work performed "on a city landmark or in a *city* historic district." (Italics added.) In ascertaining whether to grant or deny a permit, assessing a project's "detrimental" impact to a "historic district" would thus appear to encompass those districts designated for purposes of the national or state listings, and not just city-designated historic districts.

The Ordinance does not define the term "detrimental." And the S.J. Mun. Code contains no overarching or general provisions or canons to aid in the interpretation or construction of this specific term as used in S.J. Mun. Code section 13.48.240.

### C. The Parties' Positions

The Foundation offers a dictionary and plain meaning definition of "detrimental" as "tending to cause harm" or "causing damage or injury." It argues on this basis that S.J. Mun. Code section 13.48.240 mandated denial of an Historical Preservation permit here because the Project was shown to cause harm to an historic district or a structure or feature of significant architectural, cultural, historical, or aesthetic interest or value. The Foundation applies this definition to the Ordinance without regard to the extent of harm, whether great or de minimis, and without factoring or weighing relative benefits into the equation to arrive, as a matter of policy or discretionary judgment, at a net finding of a lack of detriment as the standard for the grant of an Historical Preservation permit under S.J. Mun. Code section 13.48.240.

66

The Foundation further emphasizes what we've just noted—that a textual reading of S.J. Mun. Code section 13.48.240, unlike section 21081, subdivision (b)'s statement of overriding considerations under CEQA, reflects no express provision or term permitting specific project benefits in the end to outweigh or override acknowledged detriment that is not mitigated by the imposition of conditions as a discretionary policy choice. In this respect, the Foundation contends, the Ordinance offers more protection to historic resources than CEQA, something a city is authorized to do under its municipal authority. (Cal. Const. Art. XI, § 7 [city may make and enforce within its limits all local, police, sanitary, and other ordinances and regulations not in conflict with general laws].) The Foundation goes further, contending that the Ordinance precludes the degree of detriment requiring denial of a permit to be ultimately assessed as a net effect, after factoring in perceived project benefits or goals. Instead, it urges, absolutely, that any detriment or harm at all to a historic resource, without regard to countervailing benefits or mitigating conditions, mandates denial of a permit—a position the trial court found "not . . . reasonable."

Beyond the text of the Ordinance and how it should be interpreted, the Foundation contends the record here indisputably establishes that the Project is "detrimental," as plainly defined, to historical resources—St. James Park and the historic district in which it sits. It underscores that there is uncontradicted and substantial evidence supporting certified findings under CEQA that the approved Project, even as fully mitigated and accounting for all the conditions imposed by the issued Historic Preservation permit, will have significant and unavoidable adverse impacts on—and will thus be detrimental to—historic resources protected under the Ordinance. The identified impacts are generally rooted in the degree to which the Project was found to be inconsistent with both the Secretary's Standards and the local St. James Square Historic District

67

Design Guidelines applicable to the city-designated historic district, and specifically, for the Foundation, as pertains to the Pavilion. Such inconsistencies, as found and supported in the record, would negatively affect the integrity and significance of these historical resources, and would consequently endanger or even eliminate the national and state listings of the St. James Square Historic District on the National Register of Historic Places and the California Register of Historical Resources, respectively. Thus, the Foundation contends, despite the conceded benefits of the Project, the record nonetheless establishes that, as designed, it will indisputably and unequivocally be "detrimental" to a "historic district" or to St. James Park as a "feature of significant architectural, cultural, historical, [or] aesthetic . . . interest or value," which detriment will remain despite imposed permit conditions. Therefore, according to the Foundation, S.J. Mun. Code section 13.48.240.C. required denial of the Historical Preservation permit.

Respondents' view in briefing is that the language of the Ordinance is clear and unambiguous and functions in parallel to CEQA, offering no greater protections to historical resources and providing a discretionary override, in the imposition of conditions to the issuance of an Historical Preservation permit, equivalent to CEQA's statement of overriding considerations. They do not refute the Foundation's dictionary definitions of the word "detrimental." But they provide no interpretation or analysis of the meaning of S.J. Mun. Code section 13.48.240's standard of finding a project "detrimental to an historic district or to a . . . feature of significant architectural, cultural, historical, [or] aesthetic . . . interest or value" or how that standard operates in practical application. And they appear to assume, without analysis or support in the record, that "historic district" in this context, as the object of detriment potentially caused by a project, means only a city-designated district and not a nationally or state

68

designated one. They further disregard that S.J. Mun. Code section 13.48.240's standard for granting or denying a permit additionally includes assessment of whether a project will or will not be "detrimental" to "a feature of significant architectural, cultural, historical, [or] aesthetic . . . interest or value," offering no discussion or argument of this element in their briefing.[16]

Respondents further contend that substantial evidence is present in the record to uphold the City's issuance of the Historic Preservation permit for the Project and its express finding that the Project "will not be detrimental to the St. James Square Historic District and is consistent with the spirit and purposes of the Historic Preservation Ordinance." They cite what they urge is substantial evidence of the City's no-detriment finding as to the *local* historic district, in that the Project will not defeat this municipal designation under S.J. Mun. Code section 13.48.120[17] despite its undisputed impacts to the Park's integrity as a historical resource and its negative effects on the Park as a contributor to the national and state listings, and the consequences to those listings on account of these effects. In fact, the no-detriment finding in the City Council's Resolution No. 79848 actually concerns the "St. James Square

---

[16] As noted, City Council Resolution No. 79848 made no actual findings about this prong of the standard when approving the Historical Preservation permit. But see footnote 11, *ante*, noting that the Historical Preservation permit issued by the Planning Director and ultimately approved by the City Council in Resolution No. 79848 does contain this additional finding.

[17] S.J. Mun. Code section 13.48.129 (at H.) of the Ordinance authorizes the designation of a local historic district if the proposed district "is a geographically definable area of urban or rural character, possessing a significant concentration or continuity of site, buildings, structures or objects unified by past events or aesthetically by plan or physical development." Per S.J. Mun. Code section 13.48.130.A., the historic district designation may "be rescinded . . . by the city council" "when it deems it to be in the public interest to do so."

69

Historic District," which, throughout the document and the record as a whole, is commonly the reference for the nationally designated historic district, as distinguished from the local "St. James Square City Landmark Historic District." This alone undercuts respondents' claim that the only detriment that matters for purposes of the Ordinance is on the historic district as designated by the City.

Equally important as respondents' articulated positions about the proper interpretation of the Ordinance are what their arguments omit. Respondents tender no construction or interpretation of S.J. Mun. Code section 13.48.240 tethered to the language of the Ordinance. They contended at oral argument that S.J. Mun. Code section 13.48.240 allows for "some" but not "significant detriment," but did not identify what part of the Ordinance would lend itself to this meaning. And they disavowed that interpreting or applying S.J. Mun. Code section 13.48.240 contemplates the balancing or weighing of project benefits in the assessment of degree of detriment, or that any construction of "detrimental" means a net detriment, even if this term is used as a relative one in the Ordinance.

As to their argument that the City's issuance of the Historical Preservation permit under the Ordinance is supported by substantial evidence, respondents cite the City's findings of no detriment to an historic district in ultimately approving the permit. These findings are, as paraphrased, that the Project (1) preserves the Park's location in downtown San Jose and in the historic district; (2) preserves and continues the property's historic use as a community park and the new or altered elements generally support the continued and improved use of the property as a public open space; (3) preserves significant features of the Park and maintains it as the focus of the historic district; (4) relates to the historic design intent as a reinterpretation

70

of St. James Park, with a botanically organized understory, including many new trees that would restore the Park's mostly lost tree canopy and diagonal walkways, with the design being compatible with the bulk and scale of the historic-district proportions; (5) differentiates its design from the original St. James Park and does not allow the new elements to be mistaken for original features; and (6) is mostly reversible while its design preserves the essential form and integrity of the Park's history.

      D. <u>Construction and Application of S.J. Mun. Code Section 13.48.240 Here</u>

The Foundation's dictionary meaning of the word "detrimental" as used in S.J. Mun. Code section 13.48.240 defines this term in isolation and absolutely. And it overlooks how the standard of the work of a project being "detrimental to a historic district or to a . . . feature of significant architectural, cultural, historical, [or] aesthetic . . . interest or value" (S.J. Mun. Code, § 13.48.240), as determinative of whether to grant or deny an Historical Preservation permit, is to be understood. We can in the abstract envision circumstances in which this standard necessarily involves consideration of how a project, despite some impacts, may in other respects enhance the historic character of a designated district or may further historic-preservation land-use policies more generally, such that the project is assessed in the end as not "detrimental."

In other words, "detrimental" in this context may be a flexible concept not susceptible to easy resolution by dictionary definition of the single word. Instead, it may have meaning only in material relationship to its object—what a proposed project is detrimental to—or to a baseline condition, standard, or norm of a multifaceted district, or structure or feature of significant interest or value, as these terms are used in the Ordinance. Ambiguity in the application of the standard may lie somewhere within that relationship, depending on the

71

circumstances presented. There may be instances in which ascertaining whether a project is "detrimental" to a historic district or to a structure or feature of significant interest or value involves the exercise of discretionary judgment about the type and degree of harm in the totality of circumstances, because of all the factors and considerations that, under the Ordinance, necessarily may go into a net assessment of detriment.

We note other parts of the law where the terms "detriment" or "detrimental" can present ambiguity or likewise have contextual meaning only in relation to an object of harm or after consideration of multi-layered circumstances and competing interests. For example, under Civil Code section 3282, in the general area of damages, "[d]etriment is a loss or harm *suffered in person or property*." (Italics added; see also Civ. Code, § 3333 [measure of tort damages for "all the detriment proximately caused thereby"].) In *Fulle v. Kanani* (2017) 7 Cal.App.5th 1305, 1314–1316, the court found the term "actual detriment" as used in Civil Code section 3346 to be ambiguous, susceptible to conflicting interpretations as to its scope, whether limited to purely economic damages or also extending to intangible, noneconomic damages suffered by a plaintiff for annoyance and discomfort.

In the area of juvenile dependency, Welfare and Institutions Code sections 366.21, subdivision (e)(1) and 366.22, subdivision (a) require the return of a child to a parent at different points unless the court finds that such return would create a "substantial risk of detriment to the safety, protection, physical or emotional well-being of the child"—often a multifaceted determination infused with the discretionary consideration of many interests and values. In *Guardianship of Kassandra H.* (1998) 64 Cal.App.4th 1228, 1239, fn. 6, the court observed that "detriment" as used in juvenile dependency law differs from the " 'best interest' " standard in guardianship. But the court noted that the

word " 'detrimental' " presents multiple senses. It questioned and observed: "Being worse off than you were before is not 'detriment'? Yet if detriment were defined to mean, say, 'less than another viable alternative,' then 'lack of detriment' would only be another way of saying 'best interest.' The trial judge obviously did not mean to define detriment that way. In context, the trial judge used the word 'detriment' as the term of art it has become in the juvenile law." (*Id.* at p. 1239, fn. 6.)

Under Family Code section 3041, subdivision (a), before granting custody of a child to a nonparent over the objection of a parent, a court must find that custody to a parent would be "detrimental to the child and that granting custody to the nonparent is required to serve the best interest of the child." There, " 'detriment to the child' includes the harm of removal from a stable placement of a child with a person who has assumed, on a day-to-day basis, the role of the child's parent, fulfilling both the child's physical needs and the child's psychological needs for care and affection, and who has assumed that role for a substantial period of time." (Fam. Code, § 3041, subd. (c).) This is obviously a multifaceted determination involving many potentially nuanced considerations in the exercise of the court's discretion, and "illustrates the necessity of maintaining flexibility in the concept and application of the standard of detriment set forth in Family Code section 3041." (*Guardianship of Olivia J.* (2000) 84 Cal.App.4th 1146, 1155–1156.) " '[D]etriment has no clear-cut meaning and the courts must have flexibility to make fact-specific decisions' " depending on the facts of the case. (*Id.* at p. 1157.)

Finally, in *Kalispel Tribe of Indians v. U.S. Department of the Interior* (2021) 999 F.3d 683, 685 (*Kalispel Tribe*), the Ninth Circuit Court of Appeals addressed the standard of "detrimental to the surrounding community" as stated in 25 U.S.C. section 2719(b)(1)(A) in the administrative approval of a

73

proposed gaming establishment on off-reservation land. The parties in that case offered competing interpretations of this standard, the dispute centering on whether the new gaming operation would "cause *any* detriment to a nearby Indian tribe, regardless of the net impact on the surrounding community" or whether "the gaming establishment would be detrimental to the surrounding community as a whole, rather than detrimental to any individual community member, including a nearby Indian tribe." (*Kalispel Tribe,* at p. 689.) The court acknowledged the plain and clear dictionary definition of the word "detriment" but concluded that this word alone did not resolve the dispute, which required additional interpretation and consideration of what it meant for the proposed gaming institution to be detrimental " 'to the surrounding community,' " the stated object of the detriment to be assessed. (*Id.* at p. 690.) The court rejected that the statute meant "any detriment" to a single person in the community, but rather meant to the "surrounding community as a whole," ultimately holding that this standard required the weighing and considering of "the various interests of those within the surrounding community." (*Ibid.*)

These examples illustrate our point that to ascertain whether something is "detrimental" to something else often requires more than a dictionary definition of the single word. The determination is context specific and often infused with multilayers of discretionary considerations involving competing interests and value judgments, depending on the circumstances.

We also observe that the term "significant" as modifying an architectural, cultural, historical, aesthetic, or engineering interest or value as used in S.J. Mun. Code section 13.48.240 may, in some circumstances, inherently incorporate discretion or a policy or value judgment that balances detriment against the significance of the value or interest being impaired, when assessing whether the work of a project is, in the end, "detrimental."

Having said that, we perceive that these sorts of potential ambiguities or uncertainties in the interpretation of S.J. Mun. Code section 13.48.240 and its standard for the grant or denial of an Historical Preservation permit do not present here because of the circumstances of the case and the record with which we are presented. We thus need not reach these abstract issues in this case but recognize that they may present in other cases involving the Ordinance, hence our avoidance of offering pronouncements on its correct interpretation that are unnecessary to resolve this case.

As to respondents' apparent position that "historic district," as used in S.J. Mun. Code section 13.48.240, is limited to a *city*-designated district as the object of detriment to be assessed, we reject this unsupported interpretation. As we've noted, the Ordinance definition of "[h]istoric district" is a "geographically definable area of urban or rural character, possessing a significant concentration or continuity of site, building, structures or objects unified by past events or aesthetically by plan or physical development." (S.J. Mun. Code, § 13.48.020.B.) There is nothing about this definition that is limited to *city*-designated historical districts and it would seem to encompass a district that is listed on the National Register of Historic Places and included on the California Register of Historic Resources.

Further, while the scope of the Ordinance requires an Historical Preservation for "work . . . performed" in a "*city* historic district" (S.J. Mun. Code, § 13.48.210.A., italics added), this same local qualification of "historic district" does not appear as this term is used in the standard articulated for the grant or denial of a permit—whether the work will be "detrimental to an historic district." (S.J. Mun. Code, § 13.48.240.) Neither does this local and limiting qualification appear in the articulated declaration of policy and purpose of the Ordinance as concerns "historic districts" or "districts." (S.J.

Mun. Code, § 13.48.010.) The policy, as relevant here, announces the importance of preserving of "qualities relating to the history of San Jose," which include "the continued existence and preservation of *historic districts*." (*Id.* at subd. A., italics added.) The express purpose of the Ordinance, as relevant here, is to "promote the public peace, health, safety and welfare through the preservation of landmarks and *districts* and thereby stabilize neighborhoods and areas of the city." (*Id.* at subd. B., italics added.)

Respondents offer no analysis or authority supporting what we understand their position to be—that the standard of whether the work of a project is "detrimental" to a "historic district" such that an Historical Preservation permit must be granted or denied is limited to *city*-designated historic districts. Nor did the City offer evidence that this is its longstanding interpretation of its Ordinance or urge any other factors as set out in *Yamaha* that might lead to deference to the City's interpretation, assuming for argument sake the Ordinance in this respect is susceptible to more than one reasonable interpretation such that resort to extrinsic aids is appropriate. (*Berkeley Hills, supra*, 31 Cal.App.5th at p. 896; *Riddick, supra*, ___ Cal.App.5th at p. ___ [2024 Cal.App. LEXIS 118 at pp. *21–*24; *Symons, supra*, 99 Cal.App.5th at pp. 594–595 & fn. 5.) Indeed, as we've noted, it appears that the City Council Resolution No. 79848 approving the permit found the Project not detrimental to "St. James Square Historic District," which is the nationally designated listing as distinct from the city-designated "St. James Square City Landmark Historic District." Moreover, we do not view the City's apparent interpretation here to be correct based on our reading of S.J. Mun. Code section 13.48.240 and viewing this section in the context of the Ordinance as a whole. Such a reading would add a qualifier that isn't there to limit the scope of protection afforded to historical resources under the Ordinance. And the City's current reading appears at odds

76

with the importance the City once placed on having the St. James Square Historic District nationally recognized as part of its city-wide survey of historical resources, and as a means to preservation of the Park's historic character as it remained in 1978.

Having concluded that that the term "historic district" as used in S.J. Mun. Code section 13.48.240 is not limited to *city*-designated historic districts and would include the nationally listed St. James Square Historic District, we turn to the other possible object of "detrimental" impact in this section—"a structure or feature of significant architectural, cultural, historical [or] aesthetic . . . interest or value."

However elastic this description might be under other circumstances, no one argues here that St. James Park, itself and as a contributor to a designated historic district, would not qualify under the Ordinance as a feature of significant cultural or historical value, or that some of the Park's own features would not. And the record is replete with such references. For example, City Council Resolution No. 79848 approving the Historical Preservation permit observed and found that "[t]he human use . . . of [St. James Park] over its years of existence, as a center of public life and leisure, as a forum for political discourse, for events of community importance, and as a site of commemoration, makes it one of San José's most importan[t] places, even though it lacks substantial integrity to its original form." Similarly, City Council Resolution No. 79770 approving the Project under CEQA acknowledged the "historic significance of the [P]ark and the St. James Historic District." The Planning Director's recommendation memo to the City Council concerning the permit appeal, which is incorporated into the Council's Resolution No. 79848 approving the Historical Preservation permit, observed that "St. James Park itself is the

central and key component of the [nationally designated] historic district, without which the district would lose its essence."

Even if the word "feature" as used in the Ordinance is intended to have a more granular meaning than an entire park or landmark structure, an argument respondents do not make, a "feature" would still appear to include acknowledged character-defining attributes of the Park to the extent remaining, such as the perimeter meandering walkways and the undulating perimeter path connecting them, which are negatively affected by the Project as proposed. The significance of these features is long-established and is supported by the record.

Thus, we have little difficulty under the circumstances and on this record concluding that both St. James Park, itself and as a contributor to the historic district in which it sits, whether designated nationally or locally, qualify as historical resources protected by the Ordinance. In this case, to apply S.J. Mun. Code section 13.48.240, we need not delve into more nuanced value judgments about the significance of these resources, or lack thereof, and how that calculus might interplay with an assessment of detriment or its degree.

We pointed above, in the abstract, to potential ambiguity under the Ordinance in assessing, in some circumstances, whether the work of a project is "detrimental" to an historical resource, where detriment may ultimately be a flexible concept incorporating discretion and policy judgments that also account for project benefits. Separately from that, we can rule out any interpretation of the Ordinance that equates it functionally with CEQA's statement of overriding considerations—where discretionary policy choices are expressly permitted to overcome acknowledged and unmitigated harm. Respondents urge such a parallel reading in their briefing, and the trial court so reasoned by questioning whether an Historic Preservation permit could be denied under the Ordinance

78

"where there are, as here, overriding considerations that justify CEQA approval despite significant and unavoidable adverse impact." The trial court also relied in this determination on the City Council's CEQA findings in its statement of overriding considerations for the Project—findings that reflected the existence and acknowledgment of significant and unavoidable impacts to historical resources but characterized those impacts as " 'acceptable' " in light of, and as outweighed by, specific project benefits. Although CEQA expressly permits this discretionary policy choice, in the end, notwithstanding significant and unavoidable impacts, the Ordinance contains no equivalent or similar provision. What's more, the City did not put forth or engage in such an analysis or decision here when considering and approving the Historical Preservation permit, instead confining its findings and conclusions to a lack of detriment to a protected historical resource under the Ordinance. It did not proceed by first finding detriment but overriding it by an overarching discretionary policy choice. That would be a different case.

As we have discussed, under CEQA, after addressing mitigation measures and project alternatives that are determined to be infeasible, an agency may still approve a project with significant environmental effects, including to an historic resource, if "specific economic, legal, social, technological, or other benefits outweigh the significant environmental effects." (§§ 21081, 21081.5; see Guidelines, §§ 15091, 15092, 15093.) This express option for a statement of overriding considerations confers wide discretion on policymakers to weigh and balance project benefits versus detriments and to approve a project when mitigation measures do not fully reduce identified adverse impacts to less than significant effect, so long as CEQA statutory and regulatory requirements are met. This is in keeping with CEQA's dual and sometimes conflicting purposes of environmental protection and informed public decisionmaking.

79

In contrast, the Ordinance, specifically S.J. Mun. Code section 13.48.240.C., after consideration of all input and evidence as required under subdivision A., which here includes the Project EIR and related CEQA findings along with the specified purposes of the Ordinance, mandates denial of an Historical Preservation permit if the work of a project will be "detrimental to an historic district *or* to . . . a feature of significant . . . cultural, historical [or] aesthetic . . . interest or value *and* is consistent with the purposes of [the Ordinance], *despite* any conditions that" may be imposed. (Italics added.)

In plain terms, this requires the assessment of detriment or harm, however that is performed, as a net effect or otherwise, *despite* the imposition of conditions, and denial of the permit if the detriment to the historical resource so found remains unmitigated by those conditions. There is no discretionary provision in the Ordinance to find assessed detriment, however that occurs, to be acceptable and outweighed or overridden by project benefits. Neither S.J. Mun. Code section 13.48.240 nor the Ordinance taken as a whole contain an express allowance for the discretionary weighing of project benefits against unmitigated and assessed detriment that remains despite the imposition of conditions. And the policy and purposes of the Ordinance, as expressed in S.J. Mun. Code section 13.48.010, provide no out. This section includes the policy of "harmonious, orderly and efficient growth and development of the municipality," as cited by respondents, and expresses the purpose of the Ordinance to include carrying out the City's General Plan and encouraging the development of the City "to reflect its historical . . . , cultural, and aesthetic value or tradition." But nothing about the Ordinance's expressed policy or purpose confers or allows for discretion to be exercised to override or overcome a project's assessed "detriment" to a protected historical resource in favor of project benefits. And the requirement at S.J. Mun. Code section 13.48.240.C. of

consistency with the Ordinance's purpose is additional and not alternative to a finding of no detriment as a basis for the issuance of a permit.

Nor do the features of S.J. Mun. Code section 13.48.240 that allow for the imposition of conditions to the issuance of an Historical Preservation permit provide for a discretionary override of assessed detriment. S.J. Mun. Code section 13.48.240.B. mandates the grant of a permit if, "*subject to* such conditions" (italics added) as may be imposed, the work will not be detrimental to an historic district or feature of significant cultural, historic, or aesthetic interest or value. This language means that for the grant of a permit, the imposition of conditions fully mitigates or eliminates detriment, however that is assessed. Likewise, S.J. Mun. Code section 13.48.240.C. requires denial of the permit where "*despite* any conditions" (italics added) to be imposed, detriment, however assessed, nonetheless remains. While there is discretion afforded in the imposition of conditions, this does not extend to overriding or accepting remaining detriment, however assessed, in favor of project benefits perceived to outweigh that assessed detriment.

Respondents contend this is an unreasonable misreading of the Ordinance and would lead to absurd results and thwart its purpose. But they point to no provision in the Ordinance, that, like CEQA, authorizes a discretionary override; cite no expressed purpose of the Ordinance with which this reading conflicts; cite no other conflicting term or provision within the Ordinance that requires harmonization; offer no legislative intent for a different reading or a longstanding history of the City applying the Ordinance consistently with its proffered interpretation; or identify an actual absurdity that would result from our reading of the Ordinance as distinct from CEQA's statement of overriding considerations. Nor, as a threshold, do they identify any ambiguity in the Ordinance that would require or allow resort to any such

81

extrinsic aids to construction, instead jumping to arguments rooted in purposivism and the interpretive canon on avoiding absurd results. But the purpose of any legislation is determined in the first instance with reference to its plain language; invocation of broad purpose at the expense of the statute's express terms ignores the legislative process and prevents the effectuation of legislative intent. (*Board of Governors of Federal Reserve System v. Dimension Financial Corp.* (1986) 474 U.S. 361, 373–374.)

It's true that our reading means that the Ordinance offers more protection to historical resources than CEQA affords. But there is nothing absurd or unreasonable about that. Municipalities can exercise that authority and may choose to grant themselves the power to afford more protection to historical resources when not inconsistent with state or federal law. Indeed, this Ordinance would provide little more than redundancy and superfluity if it operated in complete parallel to CEQA and afforded nothing over and above CEQA's protections. While we recognize that deference to an agency's interpretation of its own regulation is sometimes warranted under conditions described in *Yamaha, supra*, 19 Cal.4th at page 12, and that the Ordinance here is " 'entwined with issues of fact, policy, and discretion' " (*ibid.*) such that the City is " 'likely to be intimately familiar with [the Ordinance] it authored and sensitive to the practical implications of one interpretation over another' " (*ibid.*), we do not view the City's proffered interpretation of the Ordinance, infused with overriding discretion that appears nowhere in it, as correct. What's more, the City has the authority to amend the Ordinance if it so chooses to expressly provide for the overriding discretion currently lacking.

We have thus so far concluded that St. James Park, itself and as a contributor to the nationally designated historic district in which it sits, are

protected historical resources under the Ordinance.[18] We have also concluded that the Ordinance, in its omission of a provision parallel to CEQA's statement of overriding considerations, does not include a discretionary override once detriment under the Ordinance, however assessed, is found. Conditions to the issuance of a permit may involve the exercise of discretion, but under the language of S.J. Mun. Code section 13.48.240, imposed conditions must fully mitigate detriment, however assessed, for the permit to be granted. In this respect, the Ordinance offers more protection to historical resources than does CEQA. To the extent the City's ultimate decision to approve the Historical Preservation permit here involved interpretations or an application of the Ordinance inconsistent with our conclusions here, we hold that the City abused its discretion, largely by failing to proceed in the manner required by law.

We now turn to the question whether, on this record, the decision that the Project was not "detrimental" to historical resources protected by the Ordinance, which mandated the grant of the permit under S.J. Mun. Code section 13.48.240.B., constituted an abuse of discretion—meaning the decision is not supported by the findings or the findings are not supported by the record. We conclude that the decision is not supported by the findings.

As chronicled at length by the Foundation, and as discussed in this opinion, the Project as approved will indisputably have significant adverse cultural and aesthetic impacts to the Park as an historical resource and to the historical district in which it sits. These impacts were identified in the EIR (and the historical reports made a part thereof) and are included in the City's

---

[18] As to St. James Park itself, this conclusion requires support from the record, which we have identified above (at pp. 77–78, *ante*). But, as noted, no one here disputes that within the historic district, the Park qualifies under the Ordinance as a "feature of significant . . . cultural, historical, [or] aesthetic . . . interest or value." (S.J. Mun. Code, §13.48.240.)

findings appearing in Resolution No. 79770 approving the Project under CEQA (as outlined above). These impacts, as generally described, include the loss of historic integrity, the loss of identified and remaining character-defining features of the Park, the threatened status of the current listings in the National Register of Historic Places and the California Register of Historic Resources because of acknowledged inconsistencies with the Secretary's Standards and the applicable 1989 St. James Square Historic District Design Guidelines, and alterations to the character of the existing Park that would impact or affect its historic significance and that of the district. These impacts are fully supported and uncontradicted in the record.

Specifically, the City's findings of significant and unavoidable impacts and cited facts in support in its Resolution No. 79770 approving the Project under CEQA included the following, as paraphrased, all uncontradicted and supported in the record:

- Under aesthetic impacts: the Project with its new buildings and Pavilion would change the visual character of the site and, as designed, would be constructed in a manner that would impact the historical significance of the Park and the St. James Square Historic District; inconsistency with the Secretary's Standards, even in the mitigation measures, results in a significant unavoidable impact;

- Under cultural resources impacts: The Project is inconsistent with the Secretary's Standards and the 1989 St. James Square Historic District Design Guidelines and its implementation would thus impact the historic integrity of St. James Park and the St. James Square Historic District; "removing or altering character defining features such as the north/south and

84

east/west axis paths, circulate features at four corners, undulating path around the perimeter connecting the circulate features, random placement of statuary and monument, flat ground plan with a lack of topographic variation, and informal planting scheme," make the Project so inconsistent. If additional character-defining features of the Park are lost by implementation of the Project, it would no longer qualify as a contributing property to the National Register of Historic Places; therefore, the "Project would affect the historic significance of the site, change eligibility, remove character-defining features, and/or compromise integrity" (italics omitted) of the site and the historic integrity of the Park and the historic district in which it sits.

These findings, and the record that supports them, are based on *facts* that were before the City as administrative decisionmaker with respect to the Historic Preservation permit. That they were generated for purposes of environmental review under CEQA does not make them irrelevant to the standard for the grant or denial of a permit under S.J. Mun. Code section 13.48.240. Although this standard is unique to the Ordinance and different from CEQA standards, the facts are the facts, especially when the EIR was prepared with other discretionary approvals in mind and was required to be considered, under the Ordinance, S.J. Mun. Code section 13.48.240.A., in connection with the administrative process leading to the approval of the Historical Preservation permit.

The Historic Preservation permit also included findings and stated facts. The permit emphasized that St. James Park has already "lost much of its historic integrity and quality." But it does not address how the past losses

85

might vitiate the Project's further destruction of additional character-defining features and the impact of that destruction on the historic integrity and quality of the district.

The permit did acknowledge that the Project, because of its inconsistencies with the Secretary's Standards and the 1989 St. James Square Historic District Design Guidelines, will impact the national historic listing but concluded that the Park "will continue to qualify as a contributing property to the locally designated St. James Square City Landmark District and is also . . . eligible for designation as a Candidate City Landmark." The permit nonetheless concluded that the work of the Project would not be "detrimental to the significant architectural, cultural, historical and aesthetic interest or value of St. James Park and is consistent with the purposes of the Ordinance" because it, as paraphrased: (1) preserves the Park's location in downtown San Jose and in the historic district; (2) preserves and continues the property's historic use as a community park and the new or altered elements generally support the continued and improved use of the property as a public open space; (3) preserves significant features of the Park and maintains it as the focus of the historic district; (4) relates to the historic design intent as a reinterpretation of St. James Park, with a botanically organized understory, including many new trees that would restore the Park's mostly lost tree canopy and diagonal walkways, with the design being compatible with the bulk and scale of the historic-district proportions; (5) differentiates its design from the original St. James Park and does not allow the new elements to be mistaken for original features; and (6) is mostly reversible in design while preserving the essential form and integrity of the Park's history. None of the 25 permit conditions eliminated the negative impacts described above.

The City Council's Resolution No. 79848 denying the appeal of the Historic Preservation permit and approving it also included findings and stated facts. They reiterated much of what was stated in the permit and again emphasized the many changes to the Park that have already taken place. They included that the Project "preserves most of the significant character-defining features that remain a part of St. James Park. Further, the [P]roject maintains St. James Park as the focus of the historic district through the diagonal pathways and rich plantings and preserves the landscaped character and spatial understanding of the [P]ark." (Italics omitted.) Because of this, and because of the same paraphrased features of the Project in our immediately preceding paragraph above discussing the permit, the City Council found that the Project "will not be detrimental to the St. James Square Historic District and is consistent with the spirit and purposes" of the Ordinance. (Italics omitted.) Again, none of the 26 permit conditions (one added) eliminated the negative impacts described above.

Missing from these findings made in connection with the Historical Preservation permit is any explanation of how, on this record and even if supported, they show or establish that the Project will not be "detrimental to an historic district or to a . . . feature of significant architectural, cultural, historical, [or] aesthetic . . . interest or value." (S.J. Mun. Code, § 13.48.240.) None of the findings or facts stated either in the permit itself or in the City Council Resolution approving it provided any discussion of why or how the other significant CEQA findings of adverse impacts to historical resources, and substantial evidence in the record supporting them, did not amount to "detriment" under the Ordinance or how the permit findings and stated facts counteracted or vitiated that detriment. On this record, we fail to see how the CEQA findings and supporting evidence in the record, especially those relating

87

to the loss of the Park as a contributor to the St. James Square Historic District as nationally and state-listed, would not amount to "detriment" to historic resources under the Ordinance, however that standard might be assessed.

Therefore, the permit findings, which may themselves, such as they are, be supported in the record, still do not support the final administrative decision to approve the Historical Preservation permit under the Ordinance.

Respondents urge that the CEQA findings do not amount to or constitute "detriment" under the Ordinance because CEQA applies different standards, criteria, and analysis. While it's true that CEQA and the Ordinance apply different standards, criteria, and analyses, this does not negate the factual findings and undisputed supporting evidence appearing in the administrative record. After all, as we've emphasized, the EIR was prepared with other discretionary approvals in mind and it, along with Project approvals, EIR certification, and Resolution No. 79770, were considered as evidence, and were required to be so under S.J. Mun. Code section 13.48.240.A., in the City's approval of the Historical Preservation permit. Respondents' argument on this point offers no rational, legal, or evidentiary basis for their conclusion.

Respondents further contend no detriment because, as the City found, the Project preserves the Park's location, continues its historic use as a community Park, preserves some of its significant features, does not allow its new elements to be mistaken for original features, maintains the Park as the focus of the historic district; and its design is reversible. Granted, but under the Ordinance, these facts cannot override what amounts to acknowledged and uncontradicted detriment, however assessed, established by other facts, in the manner of CEQA's statement of overriding considerations. Nor does the fact that the Park may remain a contributor to the St. James Square City Landmark District, or even may constitute a local landmark itself, avoid the other uncontradicted

88

evidence and factual findings of significant adverse impacts to historical resources, i.e., detriment. The Ordinance does not limit its consideration of detriment to local concerns and it expressly contemplates broader implications and interests.

In sum, on this record, the fact of the Project's detriment to the Park as an historical resource and to the historic district in which it sits is established by acknowledged and uncontradicted evidence and findings. Other findings made by the City in issuing the permit do not change, on this record, this ineluctable conclusion. Nor do the other findings vitiate or account for the harm to historical resources that is acknowledged. Detriment to historical resources protected by the Ordinance remains despite the conditions imposed in the issued Historical Preservation permit. As we read and interpret the Ordinance, this detriment required denial of the application for the permit under S.J. Mun. Code section 13.48.240.C.

## DISPOSITION

The judgment is reversed as to the second cause of action. On remand, the trial court is directed to grant relief in mandate as to this cause of action, including set-aside of the issued Historical Preservation permit for the Project and remand to the City, in its discretion, to reconsider the Historical Preservation permit application in compliance with the Ordinance, as consistent with this opinion, or a revised application based on revisions to the Project, within the City's proper exercise of discretion. The judgment is otherwise affirmed. Each party to bear its own costs on appeal under California Rules of Court, rule 8.278(a)(3).

_____

WILLIAMS, J.*

I CONCUR:

_____

LIE, ACTING P.J.

*Sainte Claire Historic Preservation Foundation v. City of San Jose, et al.*
H050106

---

\* Judge of the Santa Clara County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Bromberg, J., Concurring:

I agree that plaintiff failed to establish a violation of the California Environmental Quality Act (CEQA) (Pub. Res. Code, § 21000 et seq.) but succeeded in establishing that City of San Jose violated its historic preservation ordinance (San Jose Mun. Code, § 13.48.010 et seq.) in issuing a permit for the St. James Park project. I write separately to point out the confusion and conflict concerning an issue central to the interpretation of that ordinance: the level of deference owed a municipality interpreting its ordinances.

The Supreme Court does not appear to have addressed this issue, and the Court of Appeal decisions doing so have adopted different standards. Some decisions hold that a municipality's interpretation of its ordinances is " 'entitled to great weight and should be respected by the courts unless it is clearly erroneous or unauthorized.' " (*Anderson v. San Francisco Rent Stabilization & Arbitration Bd.* (1987) 192 Cal.App.3d 1336, 1343; see also *City of Monterey v. Carrnshimba* (2013) 215 Cal.App4th 1068, 1087; *Horwitz v. City of Los Angeles* (2004) 124 Cal.App.4th 1344, 1354; *Carson Harbor Village, Ltd. v. City of Carson Mobilehome Park Rental Review Bd.* (1999) 70 Cal.App.4th 281, 290; *City of Oakland Residential Rent Arbitration Bd. v. Montecito-Starrbruck Investors* (1992) 3 Cal.App.4th 693, 698.) Other decisions employ a slightly different standard under which a municipality's interpretation of its ordinances is " ' " 'entitled to great weight unless it is clearly erroneous or unauthorized,' " ' " but there is no requirement that this interpretation be respected unless clearly erroneous or unauthorized. (*Symons Emergency Specialities v. City of Riverside* (2024) 99 Cal.App.5th 583, 593, fn. 5; see also *Protect our Neighborhoods v. City of Palm Springs* (2022) 73 Cal.App.5th 667, 678; *Anderson First Coalition v. City of Anderson*

(2005) 130 Cal.App.4th 1173, 1193; *Friends of Davis v. City of Davis* (2000) 83 Cal.App.4th 1004, 1015.)  Still other decisions, treating municipalities construing ordinances enacted by them like administrative agencies construing statutes enacted by the Legislature, apply the Supreme Court's decision in *Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 12-13, which requires deference if " 'the agency has expertise and technical knowledge' " relevant to the statute or if some other factor (such as a contemporaneously adopted interpretation) suggests that the agency's interpretation "is likely to be correct."  (See *Riddick v. City of Malibu* (Feb. 1, 2024, B323731) __ Cal.App.5th ___, ___ [2024 Cal.App. LEXIS 118, at pp. *21-*22]; *Van Wagner Communications v. City of Los Angeles* (2000) 84 Cal.App.4th 499, 508-510; *MHC Operating Limited Partnership v. City of San Jose* (2003) 106 Cal.App.4th 204, 219-220.)  Finally, some decisions combine the last two standards, saying that "a city's interpretation of its own ordinance ' "is entitled to great weight unless it is clearly erroneous or unauthorized," ' " and "what weight to give" is determined by "the 'complex of factors set forth by our Supreme Court in *Yamaha*." *(Berkeley Hills Watershed Coalition v. City of Berkeley* (2019) 31 Cal.App.5th 880, 896; see also *Stolman v. City of Los Angeles* (2003) 114 Cal.App.4th 916, 928.)  None of these decisions explains why one standard rather than another best reflects the deference owed a municipality construing its ordinances.

The level of deference owed municipal interpretations could have played a crucial role in this case.  As the majority points out, one of the central terms in San Jose's historic preservation ordinance—"detrimental"— is "ambiguous" (*Fulle v. Kanani* (2017) 7 Cal.App.5th 1305, 1316) and "has no clear-cut meaning."  (*Guardianship of Zachary H.* (1991) 73 Cal.App.4th 51, 66.)  For example, while the term "detrimental" may be interpreted to cover

2

any harm, no matter how slight, it also may be interpreted to mean only substantial or significant harm. In addition, "detrimental" may be interpreted to require some form of netting or weighing of opposing interests. (See, e.g., *Kalispel Tribe of Indians v. U.S. Department of the Interior* (2021) 999 F.3d 683, 690; *Stand up for California! v. United States Department of Interior* (D.C. Cir. 2018) 879 F.3d 1177, 1187.) However, San Jose has not relied on the ambiguous and elastic nature of the word "detrimental" or made any argument concerning the level or amount of harm required by its historical preservation ordinance.

Instead, the City has focused on the nature or impact of the harm, arguing that the St. James Park project would not harm any city-designated historic district. This argument fails under any level of deference because the historic preservation ordinance does not bar permits only for projects that are detrimental to a historic district; it also bars permits for projects that are "detrimental . . . to a structure or feature of significant, architectural, cultural, historical, aesthetic, or engineering interest." (San Jose Mun. Code, § 13.48.240, subd. (C).) And, if the adverse impact of the proposed project on St. James Park is not detrimental to a historic district, absent a restrictive interpretation of the term detrimental, that impact is detrimental to a structure or feature of significant interest. Consequently, there is no need in this case to determine the level of deference owed a municipality's interpretation of its own ordinance or to engage in an extensive analysis of the meaning of the ordinance in question.

Like the majority, I recognize that San Jose has authority to amend its historic preservation ordinance. For example, the city could clarify what the ordinance means by "detriment" or by "historic district." The city also could adopt a different standard for issuing permits to itself and other public

3

entities rather than private entities.  Or it could adopt special statutes for major redevelopment projects, as the State has done under CEQA.  (See, e.g., Pub. Res. Code, §§ 21178-21189.3 [creating special rules for environmental leadership development projects]; *id.*, §§ 21189.50-21189.57 [creating special rules for redevelopment of the Capitol Building Annex].)  I take no position on whether any such change would cure the problems with the St. James Park project or otherwise be subject to challenge.

_____
BROMBERG, J.

*Sainte Claire Historic Preservation Foundation v. City of San Jose, et al.*
H050106